## THE EAGLE.

1. Since the decision (A. D. 1851) in the *Genesee Chief* (12 Howard, 443), which decided that admiralty jurisdiction was not limited in this country to tide waters, but extended to the lakes and the waters connecting them ; the previous act of 1845 (5 Stat. at Large, 726), entitled "An act *extending* the jurisdiction of the District Courts to *certain* cases upon the lakes and navigable waters connecting the same," and which went on the assumption (declared in the *Genesee Chief* to be a false one) that the jurisdiction of the admiralty was limited to tide waters, has become inoperative and ineffectual, with the exception of the clause which gives to either party the right of trial by jury when requested.   The District Courts, upon whom the admiralty jurisdiction was exclusively conferred by the Judiciary Act of 1789, can, therefore, take cognizance of all civil causes of admiralty jurisdiction upon the lakes and waters connecting them, the same as upon the high seas, bays, and rivers navigable from the sea.

2. The court observes also, that from the reasons given why the act of 1845 has become inoperative, the clause (italicized in the lines below of this paragraph) in the ninth section of the Judiciary Act of 1789, which confers exclusive original cognizance of all civil causes of admiralty jurisdiction upon the District Courts, "*including all seizures under laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas,*" is equally inoperative.

ERROR to the Circuit Court for the Eastern District of Michigan. The case being thus:

1. The Constitution declares that the power of the Federal courts shall extend to "all cases of admiralty and maritime jurisdiction." And the Judiciary Act of 1789 gives to *all* the District Courts "*exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction*, including all seizures under laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas."

At the time when this act of 1789 was passed, admiralty jurisdiction, according to the ideas then generally entertained by both courts and bar, could be exercised only upon waters within the ebb and flow of the tide.\* Accordingly, in 1845, Congress, by a statute,† entitled "An act *extending* the jurisdiction of the District Courts to *certain* cases upon the lakes and navigable waters connecting the same," enacted thus:

The District Courts of the United States shall have, possess, and exercise the same jurisdiction in "matters of *contract* and *tort*, arising in, upon, or concerning steamboats and other vessels of twenty tons burden and upwards, enrolled and licensed for the *coasting trade*, and employed in the business of commerce and navigation between ports and places in *divers* States and Territories, upon the lakes and the navigable waters connecting the same, as is now possessed and exercised by the said courts in cases of the like steamboats and other vessels employed in navigation and commerce on the high seas."

About six years after this statute was passed, the case of *The Genesee Chief*‡ came before this court. And in that case it was decided that the impression that admiralty jurisdiction in this country was limited to tide waters was a mis-

---

\* The Thomas Jefferson, 10 Wheaton, 428; The Steamboat Orleans, 11 Peters, 175.

† 5 Stat. at Large, 726.                    ‡ 12 Howard, 443.

take, and that the lakes and waters connecting them were within it.

After this decision, the language of certain cases* seemed to indicate that the act of 1845 was to be regarded as *limiting* the exercise of this jurisdiction to those cases in which the act had meant, by way of extending the jurisdiction, to *grant* it.

In this state of statutory law and of judicial remark upon it, the tug Eagle, in September, 1864, was towing a brig and a barge from the head of the St. Clair River through the Detroit River; the brig being on her way from Saginaw, in Michigan, to Buffalo, in New York. The tug, getting a mile or so over the line which separates the British side of the river from ours, and out of the usual course of navigation, was sailing in shoal water, when the brig grounded and the barge, which was attached to her, ran into her stern and seriously damaged her. Thereupon the owners of the brig filed a libel in the District Court for Eastern Michigan, "in a cause of collision" against both tug and barge. It set forth that the brig was "a vessel of twenty tons and upwards, duly enrolled and licensed at the port of Buffalo, State of New York, and used in navigating the waters of the Northwestern lakes and the rivers connecting said lakes, and engaged in the business of commerce and navigation thereupon." And also that the tug and barge were also both "vessels of more than twenty tons burden, enrolled and licensed for the coasting trade, and used in navigating the waters of this State and the adjoining States, and now lying, or soon will be, at the port of Detroit, and within the admiralty and maritime jurisdiction of this court."

The answers denied knowledge of these facts stated about the brig, and called for proof, but admitted the tug and barge to be enrolled and licensed.

The answer for the barge further laid the whole blame on the tug, asserting that the sole cause of the disaster was

---

* *Ex. gr.* Allen *v.* Newberry, 21 Howard, 245; Maguire *v.* Card, Ib. 248; The Hine *v.* Trevor, 4 Wallace, 556.

her going out of the proper course of navigation; while the answer for the tug stated there was no fault with *her*, and denied that the libellants had any claim " enforceable in this court sitting in admiralty for said alleged damage."

Two questions were thus raised: the first, of merits; the second, of jurisdiction. The District Court dismissed the libel as to the barge and condemned the tug. This decree being confirmed by the Circuit Court, the case came here on appeal, where the question of merits was briefly urged, the point of jurisdiction being really the only question. It was admitted, that by the law of Canada, where this damage was done, no lien or any action exists against a wrongdoing vessel, or any right or lien *in rem*.

*Mr. Newberry, for the tug, appellant:*

1. This is an action for a tort, not one on contract; and the tort was committed in Canada. Confessedly the Canadian law gives no lien. It can exist only under our laws. But the laws of the United States can have no extra-territorial operation. Neither, if the vessel was out of our jurisdiction when the tort was committed, can a lien arise by her coming into our lines. An admiralty lien subsists from the moment the claim arises, or subsists not at all. It is a right *in* the thing, *jus in re*, and not *jus ad rem;* and attaches by operation of then existing law. If there is no such law in force at the time and place of the damage done, no lien can attach. Indeed, the rights of the parties must, in all cases, especially in actions of tort, depend upon the law of the place where the alleged rights accrued. In *Smith* v. *Condry*,* two American vessels collided in the port of Liverpool. The defence set up certain rights of parties under the law of the place of collision. This defence was sustained, and the court held, " that when a collision occurs in an English port, the rights of the parties depend on the law in force at that place.''

2. In addition to these points of general law, it should be noted that neither the tug, brig, or barge had the proper

---

* 1 Howard, 28.

characteristics to bring them within the act of 1845.   In *The Genesee Chief*, Taney, C. J., speaking for the court, states that the general jurisdiction of admiralty was limited by the act of 1845.   In *Allen* v. *Newberry*,[*] Nelson, J., speaking also for the court, says, that "the act confines the jurisdiction to cases mentioned in it."   And in *The Hine* v. *Trevor*,[†] Miller, J., says, that the jurisdiction on the lakes and waters connecting them is governed by that statute, though he said that it was not so, as was often erroneously thought in the West, upon the rivers.   Now the libel, while alleging that the tug was "enrolled and licensed" at the time of the libel filed, does not allege that she was so "for the coasting trade," or enrolled and licensed at all when the damage occurred. Nor is there *proof* that the tug was enrolled and licensed for the "coasting trade;" nor that she was employed in the business of commerce and navigation between ports and places in different states and territories, &c., "at the time," &c., or indeed at any time.   There is no proof on that subject.   The burden of proof is on the libellant to prove the alleged facts.   On the other hand, the tug was a tow-boat, towing obviously from the lower end of Lake Huron to the upper end of Lake Erie.   Both termini are within the waters of the State of Michigan, and such employment did not require the tug to go into the waters of any other State than Michigan.   She was clearly, as to her occupation, within the case of *Allen* v. *Newberry*.[‡]

*Mr. G. B. Hibbert*, *contra*, submitted an able brief, presenting with learning and force much the same views as are presented by the court; a brief of *Mr. W. A. Moore* being also filed.

Mr. Justice NELSON delivered the opinion of the court.

On the question of merits we concur with the conclusion of the courts below.   We shall only examine the questions of law.

The summary of them, as stated by the learned counsel,

---

[*] 21 Howard, 246.          [†] 4 Wallace, 556.          [‡] 21 Howard, 246.

is (1) There is no law in force in the Province of Canada, the place where the tort was committed, that gives a lien upon the vessel for the alleged damages; (2) The laws of the United States have no extra-territorial force in a foreign territory to create a lien; and (3) The admiralty lien is a right in the thing—*jus in re*, and not *jus ad rem*—and the lien must depend upon the law of the place where the alleged right occurred.

It is apparent from the grounds upon which the learned counsel has placed his claim to a reversal of the decree below, that he has entirely misapprehended the scope and effect of the decision of this court in the case of *The Genesee Chief*,* and the several cases following it.†

The leading case obliterated the limit, that had been previously adopted and enforced in the jurisdiction in admiralty, to tide-waters; and held that, according to the true construction of the grant in the Constitution, it extended to all public navigable waters, whether influenced by the tide or not. The Chief Justice, in delivering the opinion, observes: "It is evident that a definition (of the grant in the Constitution) that would, at this day, limit public rivers in this country to tide-water rivers, is utterly inadmissible. We have thousands of miles of public navigable waters, including lakes and rivers, in which there is no tide; and, certainly, there can be no reason for admiralty power over a public tide-water, which does not apply with equal force to any other public waters used for commercial purposes and foreign trade. *The lakes, and the waters connecting them*, he observes, are undoubtedly public waters, and we think are within the grant of admiralty and maritime jurisdiction in the Constitution of the United States."

It follows, as a necessary consequence of this interpretation of the grant in that instrument, the District Courts, upon whom the admiralty jurisdiction was exclusively conferred by the Judiciary Act of 1789, can take cognizance of

---

* 12 Howard, 443.

† Jackson *v.* The Magnolia, 20 Ib. 296; and The Hine *v.* Trevor, 4 Wallace, 555.

all civil causes of admiralty jurisdiction upon the lakes, and waters connecting them, the same as upon the high seas, bays, and rivers navigable from the sea.   These waters fall within the same category, and are subject to the same jurisdiction, and hence the circumstance that a portion of them lie within the limits of another sovereignty constitutes no objection to the exercise of this power.   Before the limit of tide-water was removed by the judgment in the case of *The Genesee Chief*, this jurisdiction was constantly exercised in cases of marine torts upon the high seas, bays, and rivers in which the tide ebbed and flowed, occurring in any part of the world, and, in respect to which an American ship was concerned; and, since that judgment, occurring upon any bay or public river as far as navigable, irrespective of the tide.

Since the recent acts of Parliament, in England, removing the ancient restrictions by the common law courts upon the admiralty jurisdiction, it seems to be exercised as freely and broadly as in this country.  The case of *The Diana**\* arose out of a collision on the great Holland Canal in 1862.  An exception was taken to that jurisdiction founded upon the old objection, but was overruled by Dr. Lushington.   So, in the case of *The Courier*,† which was a collision on the Rio Grande, in foreign waters.   And *The Griefswald* the same.‡

It is insisted, however, that, if the court will take jurisdiction for a collision occurring on foreign waters, and within foreign territory; *the local law* of the place of collision should govern; and hence, the law of Canada in the present case; and *Smith et al.* v. *Conary*, in this court, is cited as an authority for the doctrine.   The collision in that case occurred in the port of Liverpool, while the vessel of the defendant was coming out.   The defendant set up in defence, that by the statute law of England he was compulsorily obliged to take on board of his ship a Liverpool pilot, which he did; that she was exclusively in his charge when the accident occurred; and that this law, as construed by the courts of England,

---

     \* 1 Lushington, 539.        † Ib. 541.        ‡ Swabia, 430.

excused the owner and master of the vessel; and this was agreed to by the court, and applied to the case, the Chief Justice giving the opinion. All vessels entering into, or departing from, a domestic or foreign port, are bound to obey the laws and well-known usages of the port, and are subject to seizure and penalties for disobedience; and when submitting to them, they are entitled to all the protection which they afford. The same question was recently before Dr. Lushington in the case of a collision between the American ship Annapolis and a Prussian barque, at the same port, and the American ship was discharged on the ground as in the case above cited.* These are exceptional cases, and furnished no rule to the court below for the trial of the collision in question. It was tried there, as it should have been tried, according to the practice and principles of the courts of admiralty in this country, wholly irrespective of any local law.

An objection is also taken, that the case was not brought within the requirements of the act of 1845, so as to give the District Court jurisdiction—that is, it was not shown that the vessels were of the burden of twenty tons and upwards, or enrolled and licensed for the coasting trade, or employed, at the time, in the business of commerce and navigation between ports and places in different States.

These facts were substantially set forth in the libel, and the answers did not set up any specific exception on this ground, nor does it seem to have been taken by the respondents at all in the progress of the trial below. The objection, we think, untenable.

This act of 1845, as is apparent from several of the cases before the district courts whose districts lie contiguous to the lakes, has occasioned a good deal of embarrassment in administering their admiralty jurisdiction since the decision in the case of *The Genesee Chief*. It is quite clear, under this decision, in the absence of that act, the district courts would possess general jurisdiction in admiralty over the

---

* 1 Lushington, 295.

lakes, and the waters connecting them; and, hence, there would be no more difficulty in the administration of the law than in cases upon the high seas, or bays, or rivers navigable from the sea.

At the time it was passed, tide-water was the limit of admiralty jurisdiction, and the act was intended to remove this restriction upon the court, as it respected these lakes, and to extend the jurisdiction to them, thereby making these waters an exception as to the tide-water limit.  The power conferred by the act, however, was not *that* of general admiralty jurisdiction, but was limited to cases of " *contract and tort*, arising in, upon, or concerning steamboats, and other vessels, of twenty tons burden and upwards, enrolled and licensed for the coasting trade, and at the time employed in the business of commerce and navigation between ports and places of different States."  The better opinion, we think, is, that the act does not embrace, but necessarily excludes, cases of prize. These are neither cases of contract or tort, and the vessels engaged in making the seizure, as prize of war, which are ships of the navy, or privateers, are not employed at the time, in the business of commerce and navigation.  We think it also a matter of grave doubt if the act confers jurisdiction in cases of salvage, jettison, or general average. These are not matters of contract, according to the most eminent commentators on the subject,* and they certainly are not cases of tort.

One question, and a very important one, is, whether, since the decision of *The Genesee Chief*, which opens the lakes and the waters connecting them to the general jurisdiction of the district courts in admiralty, they can entertain this jurisdiction in cases outside of *that* conferred by this act?  If the affirmative of this question should be sustained, although the system would be disjointed and incongruous, yet it would, in its result, remedy most of the difficulties and inconveniences now existing.  But the opinions of the judges of this court, as expressed in several cases, though the ques-

---

* 1 Story's Equity Jurisprudence, § 490 ; 3 Kent, p. 246.

tion has never been directly before the court for decision, are, that the act should be regarded as restrictive of the general jurisdiction of these courts. This was the opinion expressed by the Chief Justice in the case of *The Genesee Chief*, and has been followed by other justices in this court, who have had occasion to express any opinion in the subject. The history and operation of this act of 1845, are peculiar.

It is "an act extending the jurisdiction of the district courts to certain cases upon the lakes and navigable waters connecting the same." At the time it was enacted it had the effect expressed and intended, and so continued for some seven years, when the case of *The Genesee Chief* was decided. From that time, its effect ceased as an enabling act; and has been no longer regarded as such. It is no longer considered by this court as conferring any jurisdiction in admiralty upon the district courts over the lakes, or the waters connecting them. That is regarded as having been conferred by the grant of general admiralty jurisdiction by the ninth section of the act of 1789 to these courts. The original purpose of the act, therefore, has ceased, and is of no effect; and, in order to give it any, instead of construing it as extending the jurisdiction in admiralty, it must be construed as limiting it—the very reverse of its object and intent, as expressed on its face.

In the case of *The Hine* v. *Trevor*,* it is said by the learned Justice, in delivering the opinion of the court, that the jurisdiction in admiralty on the Western rivers did not depend on the act of 1845, but was given by the original act of 1789; and he intimated further, that the jurisdiction on the lakes was also founded on this act, though governed in its exercise by the act of 1845. The case then before the court did not arise on the lakes, but on the Mississippi River; and the remarks made in respect to the jurisdiction upon the lakes, was in answer to an impression very general, as is said, among the profession in that section of the country, and even of the learned Judge whose judgment the court was

---

* 4 Wallace, 555.

reviewing, that the jurisdiction upon the rivers depended on this act of 1845. That case, not at all involving the question of jurisdiction upon the lakes, but simply upon the interior rivers, did not receive that full deliberation in respect to this question, which, in the present case, is called for. We have now examined it with care, and given to it our best consideration, and are satisfied, that since the decision of the case of *The Genesee Chief*, the court must regard the district courts as having conferred upon them a general jurisdiction in admiralty upon the lakes and the waters connecting them, by the ninth section of the original act of 1789; and the enabling act of 1845, therefore, has become inoperative and ineffectual as a grant of jurisdiction; and, as it was an act, on the face of it, and as intended, in its purpose and effect, to extend the admiralty jurisdiction to these waters, we cannot, without utterly disregarding this purpose and intent, give effect to it as a limitation or restriction upon it. We must, therefore, regard it as obsolete and of no effect, with the exception of the clause which gives to either party the right of trial by jury when requested, which is rather a mode of exercising jurisdiction than any substantial part of it. The saving clause in this act, as to the concurrent remedy at common law, is, in effect, the same as in the act of 1789, and is, therefore, of necessity, useless and of no effect.*

The ninth section of the Judiciary Act of 1789 confers exclusive original cognizance of all civil causes of admiralty jurisdiction upon the district courts, "*including all seizures under laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas.*"

When this clause first came under the consideration of the courts, there was a good deal of difficulty in determining whether the words, *including all seizures*, &c., were intended as being comprehended within the grant of general admiralty

---

* See The Belfast, 7 Wallace, 624, 644.

jurisdiction, or as, simply, within the cognizance of the district courts, as the words were ambiguous, and might be construed as either within the cognizance of the district courts or within the class of cases of general admiralty jurisdiction. The difference was material; as if not within the general admiralty jurisdiction, the parties were entitled to a trial by jury; otherwise not. This question was first decided in the case of the *United States* v. *La Vengeance*,* the court holding that the cases were included within the general admiralty jurisdiction. The point was contested in several subsequent cases, but the court adhered firmly to its first decision.† The act, notwithstanding these decisions, was still effectual and necessary to sustain the general jurisdiction, as the limit of tide-waters then prevailed in the admiralty courts, and the jurisdiction given by the act extended to waters which were navigable from the sea, irrespective of the tide. The seizures, also, in many instances, would be made within the body of a county—*infra corpus comitatus*—within which the admiralty jurisdiction was not yet admitted. (*Waring* v. *Clarke*, 5 How., 441.)

But since the decision in the case of *The Genesee Chief*, this clause, above recited, is no longer of any force. The general jurisdiction in admiralty exists without regard to it; and if any effect should be given, instead of extending, as was intended, it would restrict it; and, for the reason given in respect to the act of 1845, it has become useless and of no effect.

DECREE AFFIRMED WITH COSTS AND INTEREST.

---

* 3 Dallas, 297.

† The Sally, 2 Cranch, 406; The Betsey, 4 Id. 443; The Samuel, 1 Wheaton, 9; Ib. 20; The Sarah, 8 Id. 391.