---

OLD DOMINION INS. CO. (MURPHREY v.). See Case No. 9,945.

OLDHAM (HOLMES v.). See Case No. 6,643.

OLD NATIONAL BANK OF PROVIDENCE (KNIGHT v.). See Case No. 7,885.

---

## Case No. 10,484.

### In re OLDS et al.

[4 N. B. R. 146; (Quarto 37).] [1]

District Court, W. D. Michigan. Aug. 31, 1870.

BANKRUPTCY—COSTS—PAYMENT BY ASSIGNEE.

Where bankrupts (involuntary) complied with all the requirements of the bankrupt law [of 1867 (14 Stat. 517)], filed a petition for their discharge, there being funds in the hands of the assignee, and the final dividend not having been declared, the following question arose: "Whether the costs incurred upon the petition of bankrupts for their discharge, the hearing on said petition, publication of notice of hearing, etc., shall be paid out of the funds in the assignee's hands belonging to the estate of said bankrupts, or by the bankrupts themselves."—held, the assignee, when he has funds, should pay the costs.

[Cited in Re Elmendorf, 9 Fed. 546.]

[In the matter of M. Olds, W. Olds, and L. Olds, involuntary bankrupts.]

At Kalamazoo, in said district, on the 31st day of August, A. D. 1870.

Before J. DAVIDSON BURNS, Register in Bankruptcy:

I, the above-named register, do hereby certify that, in the course of the proceedings in said cause before me, the said bankrupts [M. Olds, W. Olds, and L. Olds] have filed a petition for their discharge; a hearing has been had thereon, no opposition has been made by any creditor to the granting of discharge; two of the bankrupts have taken the oath required by section 29 of the bankrupt act, and I have made certificate of conformity, and report in favor of their discharge. This is an involuntary case, and there are funds in the hands of the assignee, the final dividend not having been declared. The following question pertinent to the proceedings has arisen, and I have been requested to certify the same to the district judge, for his opinion thereon, to wit: "Whether the costs incurred upon petition of bankrupts for their discharge, the hearing on said petition, publication of notice of hearing, etc., shall be paid by the assignee out of funds in his hands belonging to the estate of said bankrupts, or by the bankrupts themselves." In my opinion the assignee, when he has funds, should pay such costs. The bankrupts having, by force of law, surrendered all their property to be disposed of for the benefit of their creditors, it seems just and right that the avails of such property shall, so far as necessary, be used to give the bankrupts that relief which, upon conformity to the requirements of the law, they are entitled to claim, viz., a discharge from their debts. The case would be different if creditors successfully opposed the granting of a discharge, but when no opposition is made, and the bankrupts in all things conform to their duty under the act, they should not be deprived of the discharge which (unless the costs thereof shall be paid by the assignee out of the estate funds) they may not have the pecuniary ability to obtain. Section 28 of the bankrupt act provides that in the order for a dividend, the following claims shall be entitled to priority and to be first paid in full: First, the fees, costs, and expenses of suits, and the several proceedings in bankruptcy under this act. The proceedings on petition for discharge are certainly "proceedings in bankruptcy."

WITHEY, District Judge. The decision of the register, J. Davidson Burns, Esq., certified above, is approved.

---

## Case No. 10,485.

### The OLER.

[2 Hughes, 12; [1] 14 Am. Law Reg. (N. S.) 300.]

Circuit Court, E. D. Virginia. July 14, 1874.

ADMIRALTY JURISDICTION—COLLISION ON SHIP CANAL.

1. The admiralty jurisdiction of the United States courts extends to a tort committed by

---

[1] [Reprinted by permission.]

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

collision on an artificial ship canal connecting navigable waters which are within that jurisdiction.

[Cited in The B. & C., 18 Fed. 544.]

[See The Avon, Case No. 680.]

2. Where, by collision, one vessel is left helpless in the track of navigation, and on the following day is injured by a passing vessel, the vessel in fault in the original collision is liable for the cost of repairing the injuries received by the disabled vessel in the second collision.

This is an appeal into this court from a decree of the district court, rendered on the 21st November, 1873. [Case unreported.] The leading facts are as follows: On the 21st November, 1872, the schooner Annie Cole, John Q. Hozier (the libellant), master, being in North river, North Carolina, near the mouth, laden with fresh fish for Norfolk, fell in with the steamer W. G. Oler, John E. Wyatt, master, also bound for Norfolk, and signalled the steamer for a tow. The Oler slacked her speed, threw her line, which was caught by the schooner, and the two vessels proceeded up the North river, and into the "Virginia Cut" of the Chesapeake and Albemarle Canal, until they got within two miles of the northern terminus. This was late in the day, and the steamer grounded, some say on the starboard (east), some on the port (west) side of the canal. When the steamer grounded they were moving at less than two miles an hour. The tow-rope was some two hundred feet long. As soon as the steamer grounded, the master of the Annie Cole turned her bow to the starboard bank of the canal, and ran it aground within twenty-five yards of the place where the steamer struck. The steamer soon reversed her wheel, thereby loosed herself, and commenced moving back towards the schooner. The master of the latter and his mate shouted vehemently to the steamer to stop backing, lest she should strike and sink the schooner. Three men in the schooner took poles and set them against the steamer to prevent collision, but they broke. For some reason the steamer continued to back. On nearing the schooner the action of her screw wheel had caused a "suck," which loosed the schooner from the bank. The schooner was then drawn under the steamer, where the wheel of the latter soon struck her, knocking a hole in her below the water-line so large that the schooner soon sank. The value of the cargo would have been at Norfolk from $950 to $1300. Energetic efforts were made to save it, but without success, and it proved a total loss. The steamer went on to Norfolk; the schooner remained sunk on the side of the canal in a careened position. The next day another vessel in passing struck the mast and other parts of the schooner, still further damaging her. The cost of repairs to the schooner and of raising her was $531. The libel is for damages to the vessel and the cargo, both exceeding $1500. The respondents resist the claim on several grounds, viz.: (1) They claim that the towing was gratuitous, and not for hire, and that there was no implied contract on the part of the master of the tug to sustain the risk of such an accident as happened. (2) They deny that the accident was the result of negligence on the steamer's part, but insist that it happened by the want of judgment and skill in the master of the schooner. (3) They claim that even if the steamer were responsible for the collision and direct damages, she is not responsible for the damages inflicted upon the schooner on the next day by another vessel. (4) They object that the libel is in form for breach of contract, and in fact for tort, and therefore demurrable. (5) They deny that tort committed on a canal is cognizable in an admiralty court.

Ellis and Welborn, for steamer.

Goode and Chaplain, for libellants.

HUGHES, District Judge. As to the first two objections, I think they are clearly untenable, from the evidence. The tug had towed the schooner on a former occasion for hire; and there was, independently of that fact, enough in this transaction to imply a contract for hire. It cannot be questioned that the backing of the tug for the distance of twenty yards upon the schooner, which caused the collision, was by the fault of those upon the tug. Her master was bound to the observance of care and diligence, and the facts proved upon him carelessness and positive blame.

The third objection cannot be sustained. The collision left the schooner helpless in the canal, liable to continual injury from passing vessels and otherwise. For such injuries as she was liable to sustain while in that condition, the tug was responsible. She is therefore liable for the cost of repairs for the injury which the schooner did actually sustain on the day after the collision. This is a much stronger case than that of The Narragansett [Case No. 10,017], where the court gave costs resulting from damage happening in consequence of the collision, from the injured vessel upsetting before she was got into port.

The fourth objection merely goes to the form of the libel, and not to the substance. The objection is such as can be cured by amendment at any time before the decree, and leave is given to make the amendment. This libel is in fact for tort, and the only informality consists in its using the phrase "in a cause of contract" when it ought to have said "in a cause of collision," in its opening statement of the cause of action. A like objection was overruled in the case of The Quickstep, 9 Wall. [76 U. S.] 665, where it was decided that the recital of a contract for towage in a libel for collision does not necessarily convert the libel into a proceeding on the contract. In truth, there was cause of action, both for breach of contract or bailment, and for collision; and both

causes of action might have been joined in the libel.

Coming, therefore to the fifth objection, and that on which counsel for defence laid chief stress, I am called upon to decide whether the jurisdiction of the admiralty courts of the United States extends to a tort committed on a canal, connecting two navigable rivers affected by the tides. The "Virginia Cut" of the Albemarle and Chesapeake Canal has capacity to pass a vessel of a thousand tons; and for an aggregate tonnage of fifty millions a year. An annual commerce of 400,000 tons passes through it. The number of vessels, masted and otherwise, traversing it per annum is now about 6000. It has but one lock, which is 220 feet long and 40 feet broad, and this is a tidewater lock. It connects the waters of the Elizabeth and North rivers, of Hampton Roads and Albemarle Sound, and is part of an inside chain of navigation parallel to the coast, extending from New York to Florida. It is a part of the great system of navigable waters of the Atlantic seaboard of the United States; and the magnitude and character of its commerce are such as undoubtedly place it within the admiralty jurisdiction, if it is not withdrawn therefrom by the fact that it is an artificially constructed work, open to the public, but owned by a private corporation.

Judicial opinion, as to the admiralty jurisdiction, has been quite progressive in this country. At first, the narrow view of the old English common law judges obtained in our courts; and it was held that the admiralty jurisdiction with us extended only to tidewaters, and to rivers navigable from the sea as far as they were affected by the tides. Such was the tenor of the decision of the United States supreme court in the case of The Thomas Jefferson, rendered in 1825, see 10 Wheat. [23 U. S.] 428. The position thus taken was held for twenty-six years by the court. The vast commerce of the Mississippi river and its tributaries, as well as of the Great Lakes and their connecting waters, was thus deprived of the benefit of the system of admiralty jurisdiction which had grown with the growth and accommodated itself to the wants of the commerce of the world for centuries. Some relief from this decision was found necessary. The position taken by the supreme court in The Thomas Jefferson [supra], compelled a resort to some legislative provision for the commerce of the Great Lakes and rivers; and, accordingly, congress, by the act of February 26, 1845 [5 Stat. 726], gave jurisdiction in the nature of admiralty jurisdiction to the district courts of the United States "in all matters of contract and tort," upon vessels of twenty tons, etc., etc., arising upon the Lakes and the waters connecting them. Under this act, the courts of the United States took cognizance of the class of causes it names arising in those waters, for some six years. In such causes they did not act as admiralty courts; they did not administer an admiralty jurisdiction; they acted under statutory authority as quasi admiralty courts, and administered a statutory jurisdiction in the nature of the admiralty and maritime jurisdiction. By 1851 the supreme court had arrived at a different opinion of the proper jurisdiction for the admiralty courts of the United States from that which it had held in the case of The Thomas Jefferson in 1825. Commencing in that year with the case of The Genesee Chief [12 How. (53 U. S.) 443], a case of collision occurring on Lake Ontario, in a chain of decisions reaching down to The Eagle [8 Wall. (75 U. S.) 15], decided in 1868, it has assumed positions more and more advanced on this subject, until it has come to hold that the act of 1845 conferred no powers upon the district courts of the United States which they did not already have as admiralty courts; and that their jurisdiction as admiralty courts not only extends over the ocean and its bays and harbors, its gulfs and waters, but to the inland lakes and their connecting waters, and to the interior rivers of the country to the extent of their navigable capacity, holding that the navigability of waters, open and public, brings them within the admiralty jurisdiction, and not the circumstance of their being affected by the tides or of their emptying into or opening from tidewaters. I have examined these decisions carefully, and I nowhere find that the supreme court, in defining the waters over which the admiralty jurisdiction of the district courts extends, uses any discrimination between natural public waters and artificial public waters. Chief Justice Taney, in The Genesee Chief [supra], employed language which has been substantially adopted in all recent decisions of that tribunal. He said: "There can be no reason for admiralty power over a public tidewater which does not apply with equal force to any other public waters used for commercial purposes and foreign trade," using the word public in the sense of open to the public.

I know of but one case that has come before our courts in which this question, whether the admiralty jurisdiction extends to a canal has occurred. That was the case of Scott v. The Young America [Case No. 12,-549], in which there was a collision on the Welland Canal, which is on British territory. Judge Wilkins held that the court had jurisdiction there, even under the act of 1845; which must be confessed to be a far weaker source of authority in admiralty causes arising in a foreign country, than the admiralty and maritime law itself, and the jurisdiction confers.

Another canal case was that of The Diana, decided in England and reported in [1 Lush. 539], which was quoted approvingly by our supreme court in The Eagle, 8 Wall. [75 U. S. 15]. I have not been able to consult the reporter of that case, but it was one of collision on the Great Holland Canal in 1862. The objection there raised to the jurisdiction

of the admiralty court was not that the water on which the collision occurred was an artificial canal, but was the old English objection that the canal was not a tidal water. The objection was overruled by Dr. Lushington, and the jurisdiction of the English admiralty over an inland canal in a foreign country was maintained. Acting in the spirit of the United States supreme court in all its decisions, from that of The Genesee Chief down to the present time, and upon the two precedents of canal cases which I have cited on this side of the Atlantic and Lushington on the other, I have no hesitation in deciding that causes of contract and tort arising in the Virginia part of the Albemarle and Chesapeake Canal, otherwise cognizable in admiralty, are within the admiralty jurisdiction of the court.

A decree may be taken for the libellants for $531.95, the cost of repairs to the vessel, and for $1050, the amount of loss sustained on the fish, and costs.