*Ex parte* BYERS.

(*District Court, E. D. Michigan.* October 10, 1887.)

1. ADMIRALTY—CRIMINAL JURISDICTION—FEDERAL COURTS.
   The federal courts of Michigan have no jurisdiction of a felonious assault committed upon an American vessel in the Detroit river.

2. SAME.
   The criminal jurisdiction of the federal courts does not extend to the Great Lakes and their connecting waters.

3. SAME.
   The words "upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular state," used in section 5346, Rev. St. U. S., are limited to the high seas, and to the waters connected immediately with them.

**4. SAME.**

Under the power to regulate commerce, congress may provide for the maintenance of good order and discipline, and the punishment of offenses committed upon American vessels, in whatever waters they may happen to be.

*(Syllabus by the Court.)*

Hearing upon Writ of *Habeas Corpus.*

Petitioner was charged before a United States commissioner with having committed an assault with a dangerous weapon with intent to kill one James Downs, on board the steamer Alaska, an American vessel, then navigating the Detroit river. Petitioner was examined, and committed, in default of bail, to await the action of the grand jury. He thereupon petitioned for a writ of *habeas corpus,* upon the ground that the commissioner had no jurisdiction of the offense.

*James J. Brown* and *B. T. Prentis,* for petitioner.

*Charles T. Wilkins,* Asst. Dist. Atty., for the United States.

BROWN, J. Practically, the only question in this case is that of jurisdiction. This question has been suggested before in several cases, but has never been squarely presented for adjudication in this court. The increasing frequency of crimes of this description, particularly upon excursion steamers, the inability of the state courts to deal with them, and the fact that seven other persons are now in custody or on bail for participation in this same assault, demand that it should be carefully considered and definitely settled. Jurisdiction in this case is dependent upon Rev. St. § 5346, which provides that—

"Every person who, upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular state, on board any vessel belonging, in whole or in part, to the United States, or any citizen thereof, with a dangerous weapon, or with intent to perpetrate any felony, commits an assault on another, shall be punished," etc.

With respect to the locality of the offense, the same language is used in numerous other sections of this chapter; although, in a few, jurisdiction is limited to the high seas alone. Upon the other hand, some of the more recent statutes apply to offenses committed upon any American vessel, wherever she may be. It will be observed that the language of section 5346 explicitly limits the jurisdiction, so far as the waters are concerned, in two particulars: (1) They must be within the admiralty jurisdiction of the United States. (2) They must be out of the jurisdiction of any particular state.

With respect to the *first* of these, there is no doubt that the Great Lakes and their connecting waters are within the admiralty jurisdiction of the United States; and by this we understand the *civil* admiralty jurisdiction. This was settled in the case of *The Genesee Chief,* 12 How. 449, and *The Eagle,* 8 Wall. 15, and must now be considered as beyond controversy. The exclusion of waters within the jurisdiction of any particular state, by which is meant any state in the Union, (*U. S.* v. *Pirates,* 5 Wheat. 184,) clearly limits our authority to crimes committed

upon the Canadian side of the boundary line. By the act of June 15, 1836, providing for the admission of Michigan into the Union, and by a subsequent act by which she actually became a state, the state of Michigan extends to the boundary line between Canada and the United States, along the whole length of the Detroit and St. Clair rivers. And as the jurisdiction of the state is co-extensive with her territory and with her legislative power, (*U. S.* v. *Bevans,* 3 Wheat. 336,) the state courts have, under this section, exclusive jurisdiction of all offenses committed upon this side of the middle of the channel. But as the assault in this case is charged to have been committed upon the Canadian side of the boundary line, this limitation has no effect upon our jurisdiction of this particular offense.

We are then led to consider whether any portion of the Great Lakes and their connecting waters is included within the words "high seas, or river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States." That the lakes are not "high seas" is too clear for argument. These words have been employed from time immemorial to designate the ocean below low-water mark, and have rarely, if ever, been applied to interior or land-locked waters of any description. *U. S.* v. *Wiltberger,* 5 Wheat. 76; *U. S.* v. *Wilson,* 3 Blatchf. 435; *U. S.* v. *Robinson,* 4 Mason, 307. Indeed, there is an express adjudication of this court to the effect that Lake Erie is no part of the high seas, in *Miller's Case,* 1 Brown, Adm. 156. Miller was convicted of willfully procuring the setting on fire of the passenger steamer Morning Star, plying between Detroit and Cleveland, upon Lake Erie. The indictment was framed under the act of July 29, 1850, punishing this offense when committed on the high seas. On motion in arrest of judgment, Judge WILKINS held that while it was within the constitutional competency of congress to define and punish this offense when committed upon other waters than the high seas, it had not done so, and the court could not take jurisdiction without an amendment to the act. The evidence in this case exhibited a state of facts frightful to contemplate; and yet the learned judge felt compelled to grant the motion in arrest, and discharge the prisoner.

If, then, our jurisdiction in this case can be supported at all, it must be upon the theory that the Great Lakes and their connecting waters are "rivers, havens, creeks, basins, or bays," within the meaning of the act. So far as the state courts are concerned, this question was settled adversely to our jurisdiction in the case of *People* v. *Tyler,* 7 Mich. 161, decided in 1859 by the supreme court of this state. The facts were that Tyler, a deputy-marshal of this court, in endeavoring to arrest an American vessel lying in the St. Clair river, upon the Canadian side of the boundary line, shot the master, who was taken to Port Huron, in this state, and died there. Tyler was subsequently indicted and convicted in this court of manslaughter, under the act of 1857, which uses the same language with respect to jurisdiction as is contained in the section of the Revised Statutes under consideration in this case. The question of jurisdiction was not raised, and Tyler was sentenced to 30 days' imprisonment. At the expiration of his term he was indicted in the

state court for murder, and pleaded his former conviction in bar. The case was argued and considered at great length, and with great ability, and the plea was held to be bad, upon the ground that this court had no jurisdiction to try him. The opinion was unanimous, but different grounds were assigned by the judges for their conclusion. In the opinion of the chief justice, in a note to page 162, the words "within the admiralty jurisdiction of the United States," contained in the act of 1857, had no connection with the words in the constitution, empowering the federal courts to take cognizance of "all cases of admiralty and maritime jurisdiction," but must be read in connection with, and therefore controlled and limited by, the power of congress in article 1, § 8, "to define and punish piracies and felonies committed upon the high seas, and offenses against the law of nations," and therefore they applied only to offenses committed upon the high seas. He then argued, what is perfectly obvious, that the lakes and their connecting waters are no part of the high seas. While he may have been correct in his view that the admiralty and maritime jurisdiction conferred by the constitution is exclusively a *civil* jurisdiction, although the authorities are not altogether harmonious, I am by no means satisfied with his further conclusion that these words, when used in the crimes act, should be limited by the words quoted from article 1, § 8; or, in other words, that the power of congress to punish offenses upon navigable waters is limited to piracies and felonies committed upon the high seas, and offenses against the law of nations. I apprehend that, under the power "to regulate commerce with foreign nations and among the several states," congress has undoubtedly authority to protect the lives, persons, and property of passengers, crews, and shippers, and all others connected with such navigation, by penal laws. If this be not so, then the words "river, creek, basin, or bay," used in the act, are superfluous and of no effect; and the cases in which the federal courts have taken cognizance of crimes committed in foreign and domestic waters were wrongly decided. *U. S.* v. *Ross*, 1 Gall. 624; *U. S.* v. *Keefe*, 3 Mason, 475; *U. S.* v. *Hamilton*, 1 Mason, 443; *U. S.* v. *Stevens*, 4 Wash. C. C. 547; *U. S.* v. *Bennett*, 3 Hughes, 466; *U. S.* v. *Seagrist*, 4 Blatchf. 420.

But we are not left to conjecture upon this point. In the case of *U. S.* v. *Coombs*, 12 Pet. 72, it was held that, under this grant of power to regulate commerce, congress had constitutional authority to punish the theft of goods belonging to a vessel in distress, though such thefts were committed upon the shore above high-water mark. In discussing this power, Mr. Justice STORY observed:

"It does not stop at the mere boundary line of a state, nor is it confined to acts done on the water, or in the necessary course of the navigation thereof. It extends to such acts done on land which interfere with, obstruct, or prevent the due exercise of the power to regulate commerce and navigation with foreign nations, and among the states. Any offense which thus interferes with, obstructs, or prevents such commerce and navigation, though done on land, may be punished by congress under its general authority to make all laws necessary and proper to execute their delegated constitutional powers. * * * We do not hesitate, therefore, to say that, in our judgment, the

present section is properly within the constitutional authority of congress to enact; although the offense provided for may have been committed on land, and above high-water mark."

See, also, *U. S.* v. *Holliday*, 3 Wall. 407; *U. S.* v. *Cole*, 5 McLean, 513.

If the crime be committed while the vessel is lying in a port or harbor, foreign or domestic, there is also a concurrent jurisdiction on the part of the local authorities. *Wildenhus Case*, 120 U. S. 1, 7 Sup. Ct. Rep. 385.

The provision with respect to piracies and felonies upon the high seas was probably intended to apply to a different class of cases, viz., to crimes committed upon foreign as well as domestic vessels, which are offenses against the law of nations, and punishable wherever the offender is found.

In the opinion of Mr. Justice CAMPBELL, the words of the statute should not be extended to cover an assault committed in a foreign country, unless made by one of a ship's company or passengers upon another of the inhabitants of the ship. He also held that there was no construction of the act which, under any theory of jurisdiction, could extend it to offenses committed on the *lakes*, for they come within none of the terms used; and it would be a very forced construction which would apply the statute to their connecting waters. In the opinion of Mr. Justice CHRISTIANCY the terms, "within the admiralty jurisdiction of the United States," used in this act as descriptive of place, "must, I think, be understood to be confined to those localities where that jurisdiction is complete; where the United States have the right to exercise that jurisdiction by enforcing, upon their own vessels and citizens, at least, the observance of their laws; to places where they have the right to send their executive officers to enforce the laws, to prevent the commission of offenses, to seize the vessels, and arrest the persons offending." He concurred with Justice CAMPBELL in holding that it could not be supposed that "congress intended to extend the operation of any of these acts to the rivers or the connecting waters between the Great Lakes, and yet to exclude from their operation the lakes themselves. If they intended to exclude one, and include the others, every consideration would have induced them to include the lakes and exclude the rivers; as the lakes were vastly the more important in extent and in commerce, and bear much stronger resemblance to the ocean." He also criticised the opinion of the supreme court in *The Genesee Chief*, and combated with great force of reasoning the view of Chief Justice TANEY, that the lakes and navigable rivers of the United States were within the scope of the admiralty and maritime jurisdiction, as known and understood in the United States when the constitution was adopted. Mr. Justice MANNING went still further, and held that the act of congress of 1845, extending the admiralty jurisdiction over the lakes, was unconstitutional and void; and devoted most of his opinion to a criticism of the case of *The Genesee Chief*.

While I am unable to concur in much of the reasoning of the supreme court in the *Tyler Case*, I have reached practically the same conclusion

with regard to the construction of the statute. I have no doubt of the constitutional power of congress to legislate with respect to all crimes committed upon an American vessel while navigating the lakes and their connecting waters, or any portion of them, nor, under proper acts, of our authority to take jurisdiction of offenses committed in Canadian waters, by one of a ship's crew or passengers, upon another person lawfully upon the vessel. Indeed, I understand the opinion of Mr. Justice CAMPBELL to have been largely, though not wholly, influenced by the fact that Tyler had no connection with the vessel, and was in fact a trespasser from the moment he set foot upon it. In order to get at the real significance of the words "rivers, haven, creek, basin, or bay," used in the Revised Statutes, it is instructive to recur to the original acts from which these sections were taken. This course was declared to be proper in the construction of the Revised Statutes in case of doubt, in *U. S.* v. *Bowen*, 100 U. S. 508, 513. These words were originally used in the eighth section of the crimes act of 1790, defining and punishing piracies, felonies, and revolts, although the words "within the admiralty jurisdiction of the United States" are not found there. At this time the lakes were far beyond the bounds of civilization. They possessed little, if any, commerce, except such as was carried on by fur traders and others dealing with the Indians in *bateaux* and canoes, and were clearly not within the contemplation of congress in the enactment of the act. In 1825, a new act was passed, which was subsequently incorporated into this section, in which the words of locality used were, "upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular state." These words, which were also used in several other sections of the same act, were evidently copied from the act of 1790, with the addition of the words "any arm of the sea," and "within the admiralty jurisdiction of the United States," (an alteration in fact immaterial,) and should receive the same construction. *The Abbotsford*, 98 U. S. 440. This section was literally copied in the Revised Statutes, and nothing was added to it showing any intention on the part of congress to extend its application to waters not included within the acts of 1790 and 1825. Now, it seems incredible that, if congress had designed to extend the act of 1790 to the Great Lakes, a series of waters entirely separate, distinct, and distant from the high seas and their connection, it should not at least have inserted the word "lakes;" or have used still more explicit language to designate these interior waters. The words "haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular state," following the words "high seas," seem to me very clearly to be such as are connected immediately with the high seas, and to be much the same as the words "arm of the sea," in the same section. While the word "river" may properly be used to designate the straits which connect Lake Huron and Lake Erie, it would be little short of absurd to impute to congress the intent to give criminal jurisdiction to those rivers, and not to the lakes from and into which they flow. It is equally improb-

able that jurisdiction should be given of crimes committed upon one side of the boundary line, and not upon the other, when both are within the competence of the legislative body.

The truth is, an act of congress is greatly needed to extend our jurisdiction to crimes committed upon American vessels navigating the lakes and their connecting waters. A vessel bound from Buffalo to Chicago, touching at Cleveland, passes through the waters of six states, besides those of the province of Ontario, and in her transit through the Detroit and St. Clair rivers is crossing and recrossing the boundary line almost every hour. While it may be entirely clear that a crime has been committed during the voyage, it may be utterly impossible, as it was in *Miller's Case*, above cited, to locate the time or place, and the offense goes unpunished, because there is no court having general jurisdiction of the voyage and of the vessel. If the ship be American, and bound from one American port to another, as in this case, the Canadian courts cannot be expected to take cognizance of crimes which, though nominally committed in Canadian waters, do not in fact disturb the peace and dignity of her majesty's subjects. However flagrant these crimes may be, they do not concern the people of Canada, and ought to be punished by the courts of the country in which the vessel is owned. That an American vessel is in reality a floating parcel of American soil, is a maxim of all writers upon the law of nations. (1 Bish. Crim. Law, § 579;) and is recognized in the *Case of Wildenhus*, 120 U. S. 1, 7 Sup. Ct. Rep. 385; and expressly decided in *Crapo v. Kelly*, 16 Wall. 610. See, also, *In re Ah Sing*, 13 Fed. Rep. 286. There is an additional difficulty in all these cases in the fact that the county as well as the state lines of the several states extend to the center of the lakes; and even if the particular state in which the crime is committed can be ascertained, it is often impossible to decide within what county the trial is to be had. So far as this state is concerned, this difficulty has been partly though not wholly removed by a statutory enactment giving common jurisdiction over lakes to certain counties upon their borders; but how far such practice obtains in other states, and in the dominion of Canada, I am not informed. So long as the laws remain as they are, crimes of the nature described in these proceedings must go unpunished, since offenders are not within the extradition treaty, even if the Canadian courts were willing to take cognizance of the cases.

But the heinous character of the offense charged in this case does not deprive the petitioner of the benefit of his exception to our jurisdiction, and I am reluctantly compelled to order his discharge.