# THE ROBERT W. PARSONS.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 16. Argued March 11, 12.—Decided October 26, 1903.

1. Although the Erie Canal is wholly within the state of New York, it connects navigable waters and is a great highway of commerce between ports in different states and foreign countries, and is, therefore, a navigable water of the United States within the legitimate scope of the admiralty jurisdiction of the courts of the United States.

2. The enforcement of a lien *in rem* for repairs made in a port of the State to which it belongs to a canal boat engaged in traffic on the Erie Canal and the Hudson River is wholly within the jurisdiction of the admiralty courts and such lien cannot be enforced by any proceeding *in rem* in the courts of the State of New York.

3. The contract for making such repairs is a maritime contract and its nature as such is not affected by the fact that the repairs were made in a dry dock or by the fact

4. That the canal boat was engaged in traffic wholly within the State of New York. *The Belfast*, 7 Wall. 624.

THIS was a writ of error to review a judgment of the Supreme Court of the State of New York sustaining the jurisdiction of that court to enforce a lien for repairs made by Haines to the canal boat Robert W. Parsons, which was engaged at the time in navigating the Erie Canal and Hudson River.

Defense, that the statute of the State of New York, giving a lien for such repairs and providing a remedy for enforcing the same *in rem*, is unconstitutional, so far as concerns the remedy, and an infringement upon the exclusive jurisdiction of the courts of the United States in admiralty and maritime causes.

A motion to vacate the attachment, issued upon the petition of Haines, upon the ground that the court had no jurisdiction, was denied, an appeal taken to the Appellate Division of the Supreme Court, where the case was argued, and the order of the court below affirmed by a majority of the justices. *Matter of Haines*, 52 N. Y. App. Div. 550. From the final order of the court, subsequently entered, the owner, Clara Perry, again appealed to the Appellate Division, where the order was affirmed. *In re Haines*, 57 N. Y. App. Div. 636, and again by the Court of Appeals. *In re Haines*, 168 N. Y. 586. Whereupon a writ of error was sued out from this court.

*Mr. Martin Clark* for plaintiff in error:

I. The original statute of New York for liens on vessels, chap. 482, Laws of 1862, was, so far as it provided for enforcement of maritime claims *in rem*, held unconstitutional. *In re Josephine*, 39 N. Y. 19; *Brookman* v. *Hamill*, 43 N. Y. 554; *The Hine* v. *Trevor*, 4 Wall. 555; *Voes* v. *Cockcroft*, 44 N. Y. 415; *Poole* v. *Kermit*, 37 N. Y. Super. Ct. 114; *The Belfast*, 7 Wall. 624.

Chap. 418, Laws of 1897, chap. XLIX of the General Laws, Art. II, now provides for liens on vessels. The enforcement depends upon whether the contract is maritime or not; if maritime the proceedings are in the United States courts, in other cases in the state courts.

This was necessary, as the statute provides for a lien where

labor or materials are furnished under a contract for building a boat, which the courts uniformly hold is not a maritime contract, and in such a case it must be enforced in the courts of the State, as a court of admiralty would not have jurisdiction of it. *Wilson* v. *Lawrence*, 82 N. Y. 409, p. 411; *The J. E. Rumbell*, 148 U. S. 1, and cases cited; *The Jefferson*, 20 How. 393; *The Capitol*, 22 How. 129; *Edwards* v. *Elliott*, 21 Wall. 532.

So that in determining upon the remedy of the forum, it is necessary to determine first whether or not the contract upon which the lien is based is a maritime contract. If it is, then under the statute, as well as under the authorities, " it can be enforced *only* by proceedings in the courts of the United States."

II. That a contract for making repairs upon a boat is a maritime contract is settled beyond question. *The General Smith*, 4 Wheat. 438; *The St. Lawrence*, 1 Black, 522; *Peyroux* v. *Howard*, 7 Peters, 324; *The Lottowanna*, 21 Wall. 558; Admiralty Rule 12 of this court; *The Glide*, 167 U. S. 606; *Ex parte Boyer*, 109 U. S. 629.

III. The Appellate Division laid undue stress upon the character of the vessel and did not give due weight to the navigability of the water upon which the boat was employed. Vessels that are vehicles of commerce are within the jurisdiction of admiralty regardless of methods of propulsion. *The Montello*, 20 Wall. 430; *The Daniel Ball*, 10 Wall. 557; *The General Cass*, 1 Brown's Adm. 334; *The E. A. Shores, Jr.*, 73 Fed. Rep. 342.

That a contract is to be performed wholly within a State does not exclude it from the admiralty jurisdiction of the courts of the United States. The admiralty jurisdiction, conferred by the Constitution upon these courts, extends to all contracts of a maritime character to be performed upon navigable waters. *The Mary Washington*, 1 Abb. U. S. 1, Fed. Cases No. 9229; *The Belfast*, 7 Wall. 624; *The Leonard*, 3 Ben. 263, Fed. Cases No. 8256; *U. S.* v. *Burlington & Henderson Co. Ferry Co.*, 21 Fed. Rep. 331, 336.

This rule is followed although the boat was built to navigate

the canal, and had no means of locomotion in herself. *The E. M. McChesney*, 8 Ben. 150, Fed. Cases No. 4463; *S. C.*, 15 Blatch. 183, Fed. Cases No. 4464; *The Wilmington*, 48 Fed. Rep. 566.

IV. The Erie Canal and connecting waters are public navigable waters of the United States over which the Admiralty Court has and exercises jurisdiction. *The Thomas Carroll*, 23 Fed. Rep. 912; *The Ella B.*, 24 Fed. Rep. 508; *Maloney* v. *City of Milwaukee*, 1 Fed. Rep., 611; also the Albemarle and Chesapeake Canal, *The Olie*, 2 Hughes, 12 Fed. Cases No. 10485; the Welland Canal in 1873, *The Avon*, Brown's Adm. 170, Fed. Cases No. 680; *Scott* v. *The Young American*, Newb. 101, Fed. Cases No. 12549.

Admiralty assumes jurisdiction not only over canal boats but also over a dredge and scows. *The Alabama*, 22 Fed. Rep. 449. A raft of timber, *Muntz* v. *Raft of Timber*, 15 Fed. Rep. 555. A steamer of less than five tons burden engaged in carrying freight and passengers upon navigable water, *The Pioneer*, 21 Fed. Rep. 426. A ferry-boat plying between two parts in the same State in a navigable river, *U. S.* v. *B. & H. Ferry Co.*, 21 Fed. Rep. 331. A dismantled steamboat being fitted for use as a wharfboat, *The Old Natchez*, 9 Fed. Rep. 476. A barge without sails or rudder, used for lightering, *Disbow* v. *The Walsh Bros.*, 36 Fed. Rep. 607. A bath-house built on boats and designed for transportation, *The Public Baths No. 13*, 61 Fed. Rep. 692. A contract for the repair of scows used in carrying ballast to or from vessels, *Endner* v. *Greco*, 3 Fed. Rep. 411; Benedict's Adm. §§ 213, 221, 221a; U. S. Rev. Stat. §§ 3, 542.

The limitations in *Ex parte Boyer*, 109 U. S. 629, have no bearing in this case.

V. Decisions of this court should be followed as to extent of jurisdiction of Federal courts. Constitution, Art. III, § 2; U. S. Rev. Stat. § 863, subd. 8; *York* v. *Conde*, 147 U. S. 491.

The establishment of admiralty jurisdiction of the United States courts, as now recognized in its full breadth and meaning, was reached by slow degrees, after repeated argument at the bar, and earnest discussion between the members of the

court in consultation. *The Thomas Jefferson*, 10 Wheat. 428 ; *Waring* v. *Clarke*, 5 How. 441 ; *The Genesee Chief*, 12 How. 443 ; *Allen* v. *Newbury*, 21 How. 244 ; *McGuire* v. *Card*, 21 How. 248 ; *The Moses Taylor*, 4 Wall. 441 ; *The Hine* v. *Trevor*, 4 Wall. 555 ; *The Eagle*, 8 Wall. 15 ; *The Daniel Ball*, 10 Wall. 557 ; *Ins. Co.* v. *Dunham*, 11 Wall. 1 ; *The Lottawanna*, 21 Wall. 558 ; *Maloney* v. *City of Milwaukee*, 1 Fed. Rep. 611 ; *Ex parte Boyer*, 109 U. S. 629 ; Rule 12, Admiralty, U. S. Sup. Ct. adopted 1844, changed December, 1858, May, 1872 ; *Allen* v. *Newbury*, 21 How. 244, and *McGuire* v. *Card*, 21 How. 248, overruled by *The Belfast*, 7 Wall. 624 ; *The Ann Arbor*, Fed. Cas. 407 and 408, distinguished. New York cases in Appellate Division opinion and cited by defendant in error are inapplicable. Local decisions cannot abrogate maritime law. *Workman* v. *The Mayor*, 179 U. S. 552, 563 ; Benedict's Admiralty, §§ 313, 313*a*, 313*b*. And as to admiralty jurisdiction over liens on canal boats, see *Murphy* v. *Salem*, 1 Hun, 140 ; *Chisholm* v. *Nor. Transp. Co.*, 61 Barb. 363, 388 ; *Ryan* v. *Hook*, 34 Hun, 185 ; *Wilson* v. *Lawrence*, 82 N. Y. 499.

*Mr. George F. Thompson* for defendant in error :

I. Title 4 of chap. 23, New York Code of Civil Procedure, was a reënactment of chap. 482, Laws of 1862, for the enforcement of liens against ships and vessels which had been construed by the courts of that State and held unconstitutional so far as it provided a remedy for the enforcement of a *maritime contract*, but to be constitutional and effective so far as it related to the enforcement of liens by virtue of ordinary domestic contracts for the furnishing of repairs and supplies to domestic craft, such as boats constructed and used on the inland canals of the State, it being held that these are not maritime contracts within the meaning of the Constitution of the United States. *Shepard* v. *Steele*, 43 N. Y. 52 ; *Mott* v. *Lansing*, 53 N. Y. 554 ; *Poole* v. *Kermit*, 59 N. Y. 555 ; *Nelson* v. *Lawrence*, 82 N. Y. 409 ; *Brookman* v. *Hamil*, 43 N. Y. 112 ; *Fralich* v. *Betts*, 13 Hun, 632 ; *People's Ferry Co.* v. *Biers*, 20 How. 393 to 402 ; *Allen* v. *Newbury*, 21 How. 245 ; *The Gen-*

*esee Chief*, 12 How. 443 ; *McGuire* v. *Card*, 21 How. 248 ; *Happy* v. *Mosher*, 48 N. Y. 78 ; *Delaney* v. *Britt*, 51 N. Y. 78 ; *In re Haines*, 168 N. Y. 586.

The admiralty is a maritime court instituted for the purpose of administrating the law of the sea, *The Lottawanna*, 21 Wall. 567, and the question as to the true limits of maritime law and admiralty jurisdiction is exclusively a judicial question and no state law or act of Congress can make it broader or narrower than the judicial power may determine these limits to be, but what the law is within these limitations, assuming the maritime law to be the basis of the system, depends on what has been received as law in the maritime usages of this country, and on such legislation as may have been competent to affect it.

It has never before in any case before this court been attempted to confine contracts relating to an absolutely impotent vessel (*i. e.* one propelled by horse power by means of a rope attached to a team of horses walking on the land) to the exclusive jurisdiction of the admiralty courts. In all previous cases before this court there were involved sea-going ships or vessels plying between foreign countries or engaged in coasting trade between different States and Territories, or steamboats enrolled and licensed and engaged in interstate commerce and able of themselves to travel between ports and places of different States. The question has been discussed in its various phases by this court on several occasions. *The St. Lawrence*, 1 Black, 522 ; *The Commerce*, 1 Black, 578 ; *Peyroux* v. *Howard*, 7 Peters, 324 ; *The Orleans*, 11 Peters, 175 ; *The General Smith*, 4 Wheat. 438 ; *Waring* v. *Clark*, 5 How. 452 ; *The Lexington*, 6 How. 392 ; *The Genesee Chief*, 12 How. 443, 454 ; *The Magnolia*, 20 How. 298 ; *The Jefferson*, 20 How. 393 ; *Allen* v. *Newbury*, 21 How. 245 ; *McGuire* v. *Card*, 21 How. 250 ; *The Capitol*, 22 How. 129 ; *Hine* v. *Trevor*, 4 Wall. 555 ; *The Belfast*, 7 Wall. 624 ; *The Eagle*, 8 Wall. 20 ; *The Grape Shot*, 9 Wall. 129 ; *The Lulu*, 10 Wall. 197 ; *The Kalorama*, 10 Wall. 205 ; *The Custer*, 10 Wall. 215 ; *Ins. Co.* v. *Dunham*, 11 Wall. 21 ; *Ex parte McNeal*, 13 Wall. 243 ; *Edwards* v. *Elliott*, 21 Wall. 532 ; *The Lottawanna*, 21 Wall. 558 ; *Ex*

*parte Boyer*, 109 U. S. 629; *In re Garnett*, 141 U. S. 1, 8; *The J. E. Rumbull*, 148 U. S. 1; *The Glide*, 167 U. S. 606; *Workman* v. *Mayor*, 179 U. S. 553; *Miller* v. *Mayor*, 109 U. S. 385; *The General Cass*, 1 Brown's Adm. 334; *The Daniel Ball*, 10 Wall. 557. *The Montello*, 20 Wall. 430, distinguished as arising under penal laws and the vessels being engaged in interstate commerce.

The New York statute simply extends the common law lien, and the jurisdiction of the courts remains unaffected. The principal cases decided by the courts of the State of New York on this subject are the following: *Mott* v. *Lansing*, 53 N. Y. 554; *Poole* v. *Kermit*, 59 N. Y. 555; *Wilson* v. *Lawrence*, 82 N. Y. 409.

A review of these decisions will disclose the fact that none of them are or have been in conflict with the decisions of this court on this subject. Courts of admiralty cannot and do not exercise jurisdiction in any form over what is termed as land contracts and give as a reason for this that these contracts are made on land and to be performed on land. Many of the decisions above cited reiterate this principle and it seems to be well settled, and in this regard this court has been followed by the courts of the State of New York. *People's Ferry Co.* v. *Biers*, 20 How. 393 and 402; *Shepard* v. *Steele*, 43 N. Y. 52; *Brookman* v. *Hammill*, 43 N. Y. 558.

The facts show that a contract for repairs was made on land and was performed wholly and entirely on land—in a dry dock—in an inland town. There is no reason therefore for refusing admiralty jurisdiction in the above cited cases that does not exist in this case.

MR. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

This case raises the question of the construction and constitutionality of the statutes of the State of New York, giving a lien for repairs upon vessels, and providing for the enforcement of such lien by proceedings *in rem*. The statute con-

ferring the lien, so far as it is material, is given in the margin.[1] It will be noticed that it expressly excludes liens founded upon *maritime contracts.*

That a State may provide for liens in favor of materialmen for necessaries furnished to a vessel in her home port, or in a port of the State to which she belongs, though the contract to furnish the same is a maritime contract, and that such liens can be enforced by proceedings *in rem* in the District Courts of the United States, is so well settled by a series of cases in this court as to be no longer open to question. *The General Smith,* 4 Wheat. 438; *The Planter (Peyroux* v. *Howard),* 7 Pet. 324; *The St. Lawrence,* 1 Black, 522. The remedy thus administered by the admiralty court is exclusive. *The Moses Taylor,* 4 Wall. 411; *The Hine* v. *Trevor,* 4 Wall. 555; *The Belfast,* 7 Wall. 624; *The Lottawanna,* 21 Wall. 558; *Johnson* v. *Chicago &c. Elevator Co.,* 119 U. S. 388, 397; *The J. E. Rumbell,* 148 U. S. 1, 12; *The Josephine,* 39 N. Y. 19; *Brookman* v. *Hamill,* 43 N. Y. 554; *Poole* v. *Kermit,* 59 N. Y. 554. If there were any doubts regarding this question they were completely put to rest by the case of *The Glide,* 167 U. S. 606, in which it was distinctly held, in an exhaustive opinion by Mr. Justice Gray, that the enforcement *in rem* of a lien upon a vessel for

---

[1] Laws of New York (1897), chap. 418, Vol. 1, p. 514 ; May 13, 1897.

"Sec. 30. A debt which is not a lien by the maritime law, and which amounts to fifty dollars or upwards, on a sea-going or ocean-bound vessel, or fifteen dollars or upwards on any other vessel shall be a lien on such vessel, her tackle, apparel and furniture, and shall be preferred to all other liens thereon, except mariner's wages, if such debt is contracted by the master, owner, charterer, builder or consignee of such ship or vessel, or by the agent of either of them, within this State, for either of the following purposes :

"1. For work done or material or other articles furnished in this State for or towards the building, repairing, fitting, furnishing or equipping of such vessel."

(The other subdivisions are immaterial.)

"Sec. 35. If a lien, created by virtue of this article, *is founded upon a maritime contract,* it can be enforced only by proceedings in the courts of the United States, and in any other case, in the courts of this State, in the manner provided by the code of civil procedure."

repairs and supplies furnished in her home port, was exclusively within the admiralty jurisdiction of the courts of the United States.

It is equally well established that for causes of action not cognizable in admiralty, either *in rem* or *in personam*, the States may not only grant liens, but may provide remedies for their enforcement. Contracts for the building of a ship are the most prominent examples of such as are not maritime in their character, and hence within this rule. *The Jefferson,* 20 How. 393; *The Capitol,* 22 How. 129; *Edwards* v. *Elliott,* 21 Wall. 532; *Johnson* v. *Chicago &c. Elevator Co.,* 119 U. S. 388; *Sheppard* v. *Steele,* 43 N. Y. 52.

It remains to consider whether the contract in this case, which was for repairs furnished to a canalboat in a port of the State to which she belonged, was a maritime contract. If it were, the position of the state courts was wrong. The denial of exclusive jurisdiction on the part of the admiralty court to enforce this lien must rest upon one of two propositions: either because the cause of action arose upon an artificial canal, or because a canalboat is not a ship or vessel contemplated by the maritime law, and within the jurisdiction of the admiralty court.

1. At an early day, and following English precedents, it was held by this court in *The Thomas Jefferson,* 10 Wheat. 428, that the admiralty courts could not rightfully exercise jurisdiction "except in cases where the service was substantially performed, or to be performed, upon the sea, or upon waters within the ebb and flow of the tide." The opinion is a brief one by Mr. Justice Story, and contains little more than the announcement of the general principle, and with no attempt to distinguish the English cases. It lacks wholly any display of the abundant learning which ten years before had characterized his celebrated opinion in *De Lovio* v. *Boit,* 2 Gall. 398; *S. C.,* Fed. Cas. No. 3776. The case was a strong one for the adoption of English precedents, as it concerned a voyage from a port in Kentucky up the Missouri River and back again to

the same port. It was, however, flatly overruled in *The Gene-see Chief*, 12 How. 443, and the modern doctrine established, to which this court has consistently and invariably adhered, that not the ebb and flow of the tide, but the actual navigability of the waters is the test of jurisdiction. It is true that case arose upon the Great Lakes, but the rule was subsequently extended to cases arising upon the rivers above the tidal effect. *Fretz* v. *Bull*, 12 How. 466; *The Magnolia*, 20 How. 296. In *The Daniel Ball*, 10 Wall. 557, it was held that Grand River, a navigable water wholly within the State of Michigan, being a stream capable of bearing for a distance of forty miles a steamer of 123 tons burthen, and forming by its junction with Lake Michigan a continuous highway for commerce, both with other States and with foreign countries, was a navigable water of the United States, and the rule was broadly announced that "those rivers must be regarded as public navigable rivers in law, which are navigable in fact," and that "they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries, in the customary modes in which such commerce is conducted by water." The same principle was applied in *The Montello*, 20 Wall. 411, to the Fox River in Wisconsin, although its navigability was interrupted by rapids and falls over which portages were required to be made; and to Chicago River in *Escanaba Co.* v. *Chicago*, 107 U. S. 678. See also *Miller* v. *The Mayor*, 109 U. S. 385; *In re Garnett*, 141 U. S. 1, 8.

The only distinction between canals and other navigable waters is that they are rendered navigable by artificial means, and sometimes, though by no means always, are wholly within the limits of a particular State. We fail to see, however, that this creates any distinction in principle. They are usually constructed to connect waters navigable by nature, and to

avoid the portage of property from one navigable lake or river to another; or to improve or deepen a natural channel; and they are usually navigated by the same vessels which ply between the naturally navigable waters at either end of the canal. Examples of these are the St. Clair Ship Canal, connecting St. Clair River with the lake of the same name; the St. Mary's Canal, connecting the waters of Lake Superior with those of Lake Huron; the Illinois and Michigan Canal, connecting the waters of Lake Michigan with the Mississippi River; the Welland Canal, between Lake Ontario and Lake Erie; the Suez Canal, between the Mediterranean and the Red Sea; the Great North Holland Canal, connecting Amsterdam directly with the German Ocean; and the Erie Canal, connecting Lake Erie with the Hudson River. Indeed, most of the harbors upon the lakes and Atlantic coast are made accessible by canals wholly artificial, or by an artificial channel broadening and deepening their natural approaches. Can it be possible that a cause of action which would be maritime, if occurring upon those connected waters, would cease to be maritime if arising upon the connecting waters? Must a collision which would give rise to a suit in admiralty, if occurring upon Lake Ontario, or Lake Erie, be prosecuted at common law, if happening upon the Welland Canal? This question arose in this country in the case of *The Avon*, 1 Brown's Ad. 170; *S. C.*, Fed. Cas. 680, in which Judge Emmons, in a carefully considered opinion, took jurisdiction of a collision upon that canal, although it was wholly within British territory. While this was with one exception, *Scott* v. *Young American*, Newberry's Ad. 101, the earliest case in this country, it was no novelty in England, since in *The Diana*, Lush. 539, Dr. Lushington assumed jurisdiction of a collision between two British vessels in the Great North Holland Canal, rejecting altogether the contention that the legislature did not intend to give the court jurisdiction over matters occurring in foreign territorial waters. This jurisdiction has since been declared in England to extend to collisions between foreign vessels in the Bosphorus, *The Mali*

*Ivo,* L. R. 2 Ad. & Ecc. 356; and in the Scheldt, *The Halley,* L. R. 2 Priv. Coun. 193. See also *The Thomas Carroll,* 23 Fed. Rep. 912; *The Oler,* 2 Hughes, 12; *S. C.,* Fed. Cas. 10,485; *The E. M. McChesney,* 8 Ben. 150; *S. C.,* 15 Blatch. 183; *Malony* v. *The City of Milwaukee,* 1 Fed. Rep. 611; *The General Cass,* 1 Brown's Ad. 334; *S. C.,* Fed. Cas. 5307. The tidal test was long since abolished by statute in England. 24 Vict. c. 10; May 17, 1861; Marsden on Collisions, 3d ed. 210.

Finally, in *Ex parte Boyer,* 109 U. S. 629, such jurisdiction was held by this court to extend to collisions between two canalboats occurring in the Illinois and Lake Michigan Canal, Mr. Justice Blatchford observing that "navigable water situated as this canal is, used for the purposes for which it is used, a highway for commerce between ports and places in different States, carried on by vessels such as those in question here, is public water of the United States, and within the legitimate scope of the admiralty jurisdiction conferred by the Constitution and statutes of the United States, even though the canal is wholly within the body of a State and subject to its ownership and control." The case is the more noteworthy from the fact that the canal was but sixty feet wide and six feet deep. It has never been overruled or questioned, and must be treated as settling the jurisdiction of the admiralty court over the waters of any artificial canal which is the means of communication between ports and places in different States and Territories. It is not intended here to intimate that if the waters, though navigable, are wholly territorial and used only for local traffic, such, for instance, as the interior lakes of the State of New York, they are to be considered as navigable waters of the United States. *The Montello,* 20 Wall. 411. In the case under consideration, however, the Erie Canal, though wholly within the State of New York, is a great highway of commerce between ports in different States and foreign countries, and is navigated by vessels which also traverse the waters of Hudson River from the head of navigation to its mouth.

2. But the crucial question involved in this case is whether

the exclusive admiralty and maritime jurisdiction of the Federal courts attaches to canalboats—in other words, whether they are ships or vessels within the meaning of the admiralty law. If it be once conceded, as for the reasons above given we think it must be, that navigable canals used as highways for interstate or foreign commerce are navigable waters of the United States, it would be an anomaly to hold that such jurisdiction did not attach to the only craft used in navigating such canals. It is true that, in the more modern constructions, these canals are made wide and deep enough for the largest vessels; but it so happens that the Erie Canal was built at an early day, and was adapted only for vessels of light draught and peculiar construction. The possibilities of the future were then scarcely foreseen, and even if they had been, the State was too poor to provide for anything beyond the immediate present. For those purposes the canal was amply sufficient, and for twenty years was the principal means of communication with the Northwest, and was not only the highway over which all the merchandise was carried between the Hudson River and the Great Lakes; but was largely used for the transportation of passengers in the great Western immigration which immediately followed its construction. As late as 1850 large and handsomely equipped passenger vessels were run every day at stated hours, and the canal continued to be, even after the building of the railways, a favorite method of communication with the Great Lakes. While these boats were vessels of light draught, and were drawn by animal power, they were from 150 to 300 tons capacity—larger than those out of which arose the maritime law of modern Europe, and much larger than those employed by Columbus and the earlier navigators in their discovery of the new world. It is said by a writer in the Quarterly Review and quoted in Ben. Ad. Practice, sec. 220, that "the first discoverers of America committed themselves to the unknown ocean in barks, one not above fifteen tons; Forbisher, in two vessels of twenty or twenty-five tons; Sir Humphrey Gilbert, in one of ten tons only." The ships in

which the Vikings of Scandinavia invaded England, and ravaged the coasts of western Europe, (specimens of which are still preserved at Christiania,) were open boats, not exceeding 100 feet in length and 16 in breadth, and propelled partly by oars and partly by a single sail. In fact, neither size, form, equipment nor means of propulsion are determinative factors upon the question of jurisdiction, which regards only the purpose for which the craft was constructed, and the business in which it is engaged.

The application of this criterion has ruled out the floating dry dock, the floating wharf, the ferry bridge hinged or chained to a wharf, the sailors' Bethel moored to a wharf, *Cope* v. *Valette Dry Dock Co.*, 119 U. S. 625; and a gas float moored as a beacon, *The Whitton*, L. R. 1895, P. 301; *S. C.*, L. R. 1896, P. 42; *S. C.*, L. R. 1897, A. C. 337.

But it has been held in England to include a fishing coble, a boat of ten tons burthen, twenty-four feet in length, decked forward only, though accustomed to go only twenty miles to sea, and to remain out twelve hours at a time, *Ex parte Ferguson*, L. R. 6 Q. B. 280; a barge, *The Malvina*, Lush. 493, affirmed on appeal, Brown & Lush. 57; though not a dumb barge, propelled by oars only, *Everard* v. *Kendall*, L. R. 5 C. P. 428; and in America to steamers of five tons burthen, engaged in carrying freight and passengers upon navigable waters, *The Pioneer*, 21 Fed. Rep. 426; *The Ella B.*, 24 Fed. Rep. 508; *The Volunteer*, 1 Brown's Ad. 159, affirmed 15 Int. Rev. Rec. 59; a barge, without sails or rudder, used for transporting grain, *The Wilmington*, 48 Fed. Rep. 566; a floating elevator, *The Hezekiah Baldwin*, 8 Ben. 556. See also *The Northern Belle*, 9 Wall. 526; *The Alabama*, 22 Fed. Rep. 449; *Endner* v. *Greco*, 3 Fed. Rep. 411.

Again, in *Ex parte Boyer*, 109 U. S. 629, this court held the jurisdiction of the admiralty court to extend to a collision between two canalboats of more than twenty tons burthen, one of which was in tow and the other propelled by steam. If the jurisdiction of the admiralty court in the case under consid-

eration depends, as it must, upon the facts that the cause of action arose upon the canal, and upon canalboats navigating such canal, the case of *Boyer* would seem to be decisive of this.

So far as the Congress of the United States and the Parliament of England have incidentally spoken upon the subject, they have fixed a criterion of size as to what shall be considered a vessel within the admiralty jurisdiction far below the tonnage of an ordinary canalboat. By the original Judiciary Act of 1789, section nine, 1 Stat. 73, c. 20, jurisdiction was given to the District Courts of all seizures made "on waters which are navigable from the sea by vessels of ten tons or more burthen;" and by the act of February 26, 1845, 5 Stat. c. 20, 726 (now obsolete), *The Eagle*, 8 Wall. 15, admiralty jurisdiction was given to vessels navigating the Great Lakes and their connecting waters of twenty tons burthen and upwards. By section 4311, Rev. Stat., vessels of twenty tons and upwards, enrolled and licensed, and vessels of less than twenty tons, not enrolled but licensed, shall be deemed vessels of the United States; and by section 4520 all vessels of fifty tons or upwards are required to ship their seamen under writ' n articles. By the English Merchants' Shipping Act of 1854, the word "ship shall include every description of vessel used in navigation, not propelled by oars;" and a similar description is given of vessels within the admiralty jurisdiction, in the Admiralty Court Act of 1861.

It seems, however, to be supposed that the fact that boats engaged in traffic upon the Erie Canal are drawn by horses is sufficient of itself to exclude them from the jurisdiction of the admiralty courts. This, however, is an argument which appeals less to the reason than to the imagination. So long as the vessel is engaged in commerce and navigation it is difficult to see how the jurisdiction of admiralty is affected by its means of propulsion, which may vary in the course of the same voyage, or with new discoveries made in the art of navigation. Thus, canalboats, upon their arrival at Albany, are at once relieved of their horses, and taken by a steamer in tow

to New York or Jersey City. To hold that such boats are not within the admiralty jurisdiction of the courts, while on a trip down the Hudson River, would require us to overrule a large number of cases in this court, in which it was assumed by both parties and the court that for damages sustained by collision with other vessels they were entitled to pursue the wrongdoer in courts of admiralty. *The Quickstep*, 9 Wall. 665; *The Syracuse*, 12 Wall. 167; *The Atlas*, 93 U. S. 302; *The L. P. Dayton*, 120 U. S. 337; *The E. A. Packer*, 140 U. S. 360. But it would seem like sticking in the bark to hold that a canalboat might recover for a collision while in tow of a tug, but might not recover while in tow of a horse. The case does not raise the question whether hay and oats furnished the horses are necessaries within the meaning of the admiralty law, though a casuist might have difficulty in drawing a distinction between coal and oil furnished to one engine of propulsion and hay and oats to another, or between food furnished to a crew and food furnished to the horses.

Replying to the suggestion that, if jurisdiction were sustained of repairs upon a canalboat drawn by horses, it would apply with equal propriety to a blacksmith's bill for shoeing the horses, it is only necessary to say that, for incidental repairs made on land to articles of a ship's furniture or machinery, it has never been supposed that a court of admiralty had jurisdiction. Indeed, it would seem extremely doubtful if liens for these trivial bills were intended to be created by the state law. Articles removed from a vessel and repaired or renovated upon land at the shop of the artisan, stand upon quite a different footing from repairs made upon the vessel herself, and are the subject of a possessory lien at common law.

The truth is, the present employment of horses is a mere accident, and likely to be changed at any time by an enlargement of the canal, now in contemplation, when steam or electricity will probably supplant the present methods of locomotion. The modern law of England and America rules out

of the admiralty jurisdiction all vessels propelled by oars, simply because they are the smallest class and beneath the dignity of a court of admiralty; but long within the historic period, and for at least seven hundred years, the triremes and quadriremes of the Greek and Roman navies were the largest and most powerful vessels afloat.

It is true the amount involved in this case is a small one, but the jurisdiction of the admiralty court has never been determined by the amount; though appeals from the District Court to the Supreme Court were first limited to cases involving $300, subsequently reduced to $50, and finally, by the Court of Appeals act, allowed apparently in all cases regardless of amount. So, also, cases may be brought under the patent and copyright laws, quite irrespective of the amounts involved.

3. As heretofore observed, the exclusive jurisdiction of the admiralty court in this case was attacked upon the grounds, already discussed, that artificial canals and the vessels plying thereon are not within its jurisdiction. A further suggestion, however, is made that the contract in this case was not only made on land but was to be performed on land, and was in fact performed on land. This argument must necessarily rest upon the assumption that repairs put upon a vessel while in dry dock are made upon land. We are unwilling to admit this proposition. A dock is an artificial basin in connection with a harbor, used for the reception of vessels in the taking on or discharging of their cargoes, and provided with gates for preventing the rise and fall of the waters occasioned by the tides, and keeping a uniform level within the docks. A dry dock differs from an ordinary dock only in the fact that it is smaller, and provided with machinery for pumping out the water in order that the vessel may be repaired. All injuries suffered by the hulls of vessels below the water line, by collision or stranding, must necessarily be repaired in a dry dock, to prevent the inflow of water, but it has never been supposed, and it is believed the proposition is now for the first time made, that such repairs were made on land. Had the vessel been

hauled up by ways upon the land and there repaired a different question might have been presented, as to which we express no opinion; but as all serious repairs upon the hulls of vessels are made in dry dock, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs. No authorities are cited to this proposition and it is believed none such exist.

Suppose, for instance, it were believed that the repairs could be made upon this vessel without going into dry dock, but it was afterward discovered that the injuries were more extensive and that a dry dock were necessary; would a court of admiralty thereby be deprived of jurisdiction? Or, suppose such repairs were made in a floating dry dock, as sometimes happens, would they be considered as made upon land or water? Or, suppose they were made in dry dock upon a seagoing vessel?

There is no doubt of the proposition that a dry dock itself is not a subject of salvage service or of admiralty jurisdiction, because it is not used for the purpose of navigation. That was settled in *Cope* v. *Vallette Dry Dock Co.*, 119 U. S. 625. But the case was put upon the express ground that a dry dock was like a ferry bridge or sailors' floating meeting house, and was no more used for the purposes of navigation than a wharf or a warehouse projecting into or upon the water.

4. Suggestion is also made that the admiralty jurisdiction of the Federal courts does not extend to contracts for the repair of vessels engaged wholly in commerce within a State. It is true that as late as 1858, in *The Fashion* (*Allen* v. *Newberry*), 21 How. 244, it was held that, under the act of Congress of 1845, extending jurisdiction of the Federal courts to vessels employed in navigation upon the Great Lakes, between ports and places in different States, it did not extend to the case of a shipment of goods from a port in one State to another port in the same State; and that in the case of *The Goliah* (*McGuire* v. *Card*), 21 How. 248, the same doctrine

was extended to a contract for supplies furnished to a vessel engaged in trade between different ports in the State of California. These cases, however, were practically overruled by that of *The Belfast*, 7 Wall. 624, in which a state statute, similar to the statute of New York involved in this case, for a breach of contract of affreightment between ports in the same State, (Alabama,) was held to be unconstitutional and void, although the shipment was between ports of the same State. The contention was distinctly made (p. 635) that the state court had jurisdiction because the contract of affreightment was between ports and places in the same State, but it was as distinctly disclaimed by the court, and the prior cases practically overruled. So also in *Ex parte Boyer*, 109 U. S. 629, the doctrine of *The Belfast* was reiterated and applied to a collision between canalboats, Mr. Justice Blatchford saying: "That it makes no difference as to the jurisdiction of the District Court, that one or the other of the vessels was at the time of the collision on a voyage from one place in the State of Illinois to another place in the same State." To the same effect are *The Daniel Ball*, 10 Wall. 557; *The Montello*, 20 Wall. 411; *The Commerce*, 1 Black, 574, and *Lord v. Steamship Co.*, 102 U. S. 541.

So, too, in *In re Garnett*, 141 U. S. 1, the limited liability act was held to be a part of the law of the United States, enforceable upon navigable rivers above tide waters, and applicable to vessels engaged in commerce between ports in the same States. In delivering the opinion Mr. Justice Bradley said (p. 15): "In some of the cases it was held distinctly that this jurisdiction does not depend upon the question of foreign or interstate commerce, but also exists where the voyage or contract, if maritime in character, is made and is to be performed wholly within a single State"—citing all the cases noticed in this opinion.

In *The E. M. McChesney*, 8 Ben. 150, Judge Blatchford, more recently of this court, sustained a libel against a canalboat for non-delivery of a cargo shipped on a canalboat in

Buffalo to be carried to New York. In that case, as in this, it was contended that neither the canal nor the canalboat were subjects of the admiralty jurisdiction. The case is directly in point.

It is believed that since the case of *The Belfast*, 7 Wall. 624, the distinction has never been admitted between contracts concerning vessels engaged in trade between ports of the same and between ports of different States. Of course, nothing herein said is intended to trench upon the common law jurisdiction of the state courts, which is, and always has been, expressly saved to suitors "where the common law is competent to give it." Rev. Stat. sec. 563, sub. 8. By that law an action will always lie against the master or owner of the vessel, and, if the laws of the State permit it, the vessel may be attached as the property of the defendant in the case. But, as remarked by Mr. Justice Miller in *The Hine* v. *Trevor*, 4 Wall. 555, 571: A statute providing that a vessel may be sued and made defendant without any proceeding against the owners, or even mentioning their names, partakes of all the essential features of an admiralty proceeding *in rem*, of which exclusive jurisdiction is given to the District Courts of the United States. See also *The Moses Taylor*, 4 Wall. 411, 427, wherein it is said: "The action against the boat by name, authorized by the statute of California, is a proceeding in the nature and with the incidents of a suit in admiralty. The distinguishing and characteristic feature of such suit is that the vessel or thing proceeded against is itself seized and impleaded as the defendant, and is judged and sentenced accordingly."

In *The Belfast*, 7 Wall. 624, a proceeding was taken in a state court in Alabama for the enforcement of a lien for the loss of certain cotton. The statute was, in its essentials, a reproduction of the New York statute under consideration. Plaintiffs contended that, admitting the admiralty courts had jurisdiction, the state courts had concurrent jurisdiction to afford the parties the same remedies. It was held that state

legislatures had no authority to create a maritime lien, or to enforce such a lien by a suit or proceeding *in rem*, as practiced in the admiralty courts.

In all these cases the distinction is sharply drawn between a common law action *in personam* with a concurrent attachment against the goods and chattels of the defendant, subject, of course, to any existing liens, and a proceeding *in rem* against the vessel as the debtor or "offending thing," which is the characteristic of a suit in admiralty. The same distinction is carefully preserved in the general admiralty rules prescribed by this court; rule second declaring that in suits *in personam* the mesne process may be "by a warrant of arrest of the person of the defendant, with a clause therein that if he cannot be found, to attach his goods and chattels to the amount sued for;" and rule nine, that in suits and proceedings *in rem* the process shall be by warrant of arrest of the ship, goods or other things to be arrested, with public notice to be given in the newspapers. The former is in strict analogy to a common law proceeding and is a concurrent remedy. The latter is a proceeding distinctively maritime, of which exclusive jurisdiction is given to the admiralty courts. That the New York statute belongs to the latter class is evident from the code, by which, upon written application to a justice of the Supreme Court, a warrant is issued for the seizure of the vessel, and for an order to show cause why it should not be sold to satisfy the lien. The warrant in this case recites "that an application had been made to me . . . for a warrant to enforce a lien against the canalboat or vessel called Rob't W. Parsons," and commands the sheriff "to seize and safely keep said canalboat to satisfy said claim . . . as above set forth, to be a lien upon said vessel according to law." The proceeding authorized by the New York statute in question was held to be in the nature of a suit in admiralty in *The Josephine*, 39 N. Y. 19, and *Brookman* v. *Hamill*, 43 N. Y. 554. The proceeding is also similar to that provided by the laws of Massachusetts, which, in the case of *The Glide*, 167 U. S. 606,

was held to be, as to repairs and supplies in the home port, exclusively within the admiralty jurisdiction of the Federal courts.

As section 30 of the New York statute excludes a debt which is not a lien by the maritime law, and Code § 3419, providing for their enforcement, also excludes liens founded upon a maritime contract, we think the state courts were in error in enforcing this lien, thereby holding that a contract for the repair of a canalboat while lying in the Erie Canal was not a maritime contract, and that the statute so construed is *pro tanto* unconstitutional.

*The judgment of the court below must, therefore, be reversed, and the case remanded to the Supreme Court of the State of New York for further proceedings not inconsistent with this opinion.*

MR. JUSTICE BREWER, with whom the CHIEF JUSTICE and MR. JUSTICE PECKHAM concurred, dissenting.

I am unable to concur in the opinion and judgment in this case, and deem the matter of sufficient importance to justify an expression of my reasons therefor.

It is well to understand exactly the facts of the case. Sections 30 and 35 of the Laws of New York, 1897, chap. 418, are quoted in the opinion of the court. By the first a lien is given on a seagoing or oceanbound vessel, if the amount of the debt is $50 or upwards, and on any other vessel if $15 or upwards. And among other things the lien is for work done or material or other articles furnished for the building or repairing of such vessel. By the second the lien, if founded upon a maritime contract, can be enforced only in the United States courts; if not founded upon such a contract, by proceedings in the state courts, in the manner provided by the Code of Civil Procedure.

The canalboat, upon which the lien was claimed, was not a seagoing or oceanbound vessel, but engaged in carrying merchandise between Buffalo and other ports within the limits of the State of New York. The statements in two affidavits,

THE ROBERT W. PARSONS. · 39

191 U. S. BREWER, J., FULLER, C. J., and PECKHAM, J., dissenting.

·one of the plaintiff and the other the defendant, (the plaintiff being the owner of the claim and the defendant the owner of the boat,) were, by stipulation between the parties, agreed upon as the facts in the case. No question was made of the justice of the claim or the liability of the owner of the boat therefor. The work consisted in "permanent repairs upon the boat," in this that "a part of one side of said boat was taken out and her cheek plank removed and the side of the boat and the cheek plank were rebuilt into said boat." The work was done upon dry docks belonging to the plaintiff in the village of Middleport, a village located on the Erie Canal. The boat at the time was on a trip from New York to Buffalo. The value of these permanent repairs was $154.40, and the boat when thus repaired sold for only $155. Further, according to the bill of particulars, 727 feet of lumber, 47 bolts, 165 pounds of spikes and 265 pounds of iron, as well as 334 hours of labor, which, at 10 hours a day, amounted to over 33 days, were used in the work. The size of the canalboat is not given, but from this statement as to the amount and value of the work it is evident that the repairs might well be considered a rebuilding of the boat. Be that as it may, the contract was made on land, to be performed on land, and was in fact performed on land. The plaintiff was a canalboat builder, having dry docks and yards at the village of Middleport, and on these dry docks the work was done.

Was this a maritime contract? A contract for building a ship or supplying materials for her construction is not a maritime contract. *People's Ferry Co. of Boston* v. *Beers*, 20 How. 393; *Roach* v. *Chapman*, 22 How. 129. In the former of these cases the court said (p. 402): "So far from the contract being purely maritime, and touching rights and duties appertaining to navigation (on the ocean or elsewhere), it was a contract made on land, to be performed on land."

So in *Sheppard* v. *Steele*, 43 N. Y. 52, 56:

"The claim here, is for labor upon the hull of a vessel, while in the process of construction, before launching, while yet on

the land. This is not a maritime contract. It is one relating to a subject on the land, and it is to be performed on the land. The admiralty courts have no jurisdiction for its enforcement. *Foster* v. *The Richard Busteed*, 100 Mass. 409."

That a dry dock is to be considered as land in the maritime law seems to be clear from the decision of this court in *Cope* v. *Vallette Dry Dock Company*, 119 U. S. 625, in which it was held that a dry dock was not a subject of salvage service, Mr. Justice Bradley, speaking for the court, saying (p. 627): "A fixed structure, such as this dry dock is, not used for the purpose of navigation, is not a subject of salvage service, any more than is a wharf or a warehouse when projecting into or upon the water." The dry dock referred to in this case was a floating dock fastened by chains to the bank of the Mississippi River. Whether the dock in this case was likewise fastened by chains or a structure permanently attached to the land does not appear. Certainly it cannot be presumed, for the purpose of reversing the judgments of the state courts, that it was not permanently attached to and as much a part of the land as a bridge or a wharf.

In this connection reference may be had to *Bradley* v. *Bolles*, Abbott's Admiralty Reports, 569, in which it was held by Judge Betts that work done upon a vessel in a dry dock in scraping her bottom preparatory to coppering her is not of a maritime character, and that compensation for such labor cannot be recovered in a court of admiralty. Judge Betts says in his opinion that the court had repeatedly held that contracts of that description do not constitute a lien upon vessels which can be enforced in admiralty. In *Boon* v. *The Hornet*, Crabbe, 426, a canalboat was hauled on shore on the bank of a river where the tide ebbed and flowed, and there repaired. It was held that, although the law of the State gave a lien, the admiralty court would not take cognizance of such a claim.

So also where damage is done wholly upon the land admiralty will not take jurisdiction, although the cause of the

damage originated on waters subject to its jurisdiction. *The Plymouth*, 3 Wall. 20; *Ex parte Phenix Insurance Company*, 118 U. S. 610; *Johnson v. Chicago & Pacific Elevator Company*, 119 U. S. 388. Two of these were cases in which fire originating on a vessel communicated to property on land, and the owner of the property attempted to recover in the admiralty courts, but their jurisdiction was denied. The other was where a vessel, while being towed in the Chicago River, struck and damaged a building on the land. For this damage an action was maintained in the state court and the jurisdiction of that court upheld. It would seem to follow from these cases that a contract made on land, to be performed on land, and in fact performed on land, is not subject to admiralty jurisdiction. And, likewise, that a tort resulting in injury to something on the land is also not subject to admiralty jurisdiction, although the tort was on waters subject to such jurisdiction. It is true many cases may be found in which it is stated generally that admiralty has jurisdiction of claims for repairs upon vessels, but evidently that contemplates repairs made while the vessel is in the water.

In this connection I notice a statement in the opinion of the court, that "for incidental repairs made on land to articles of a ship's furniture or machinery it has never been supposed that a court of admiralty had jurisdiction." But if an engine be taken out of a steam tug and repaired on land, and a court of admiralty has no jurisdiction of the claim for such repairs, has it any more claim when the hull of a canalboat is brought on to the land and the side of it replaced? In each case the contract is one performed on the land, and although having ultimate relation to navigation on the water it is not of itself directly connected with navigation.

Further, no objection can of course be made to the New York statutes. Section 30 gives a lien, and no one questions the power of a State to provide for such a lien to be enforced in some court. Section 35 provides that if the lien is founded on a maritime contract it is enforcible only in the courts of the

United States. Surely that is as far as the most strenuous advocates of an extended admiralty jurisdiction can claim, and it is only in those cases, as the section provides, where the lien is not founded upon a maritime contract, that the state courts may exercise jurisdiction. The state courts of New York, from the trial through the Supreme to the Court of Appeals, have all held that this lien was not founded upon maritime contract. Upon what just ground can this court disturb this finding? If it be a pure question of fact, we have often held that we are bound by the action of the state courts. If it is one partly of fact and partly of law, then surely we ought not, except in the clearest case, to reverse those courts.

Still again, it has been repeatedly declared by this court, following the statute, that a claim cognizable in admiralty can be enforced in the state courts by common law remedies. Now, whatever may be the nature of the contract, (the foundation of the lien in this instance,) the only provision in section 35 is that it can be enforced in the manner provided by the Code of Civil Procedure.

Turning to the Code of Civil Procedure, we find in Title IV of chapter 23 the provisions for the enforcement of liens on vessels. These provisions are, first, the lienor is to make a written application to a justice of the Supreme Court for a warrant to enforce the lien and to collect the amount thereof, which application must state substantially the same facts as in an ordinary pleading to enforce a mechanic's lien on buildings. Section 3420. Upon the filing of such application the justice is directed to issue a warrant for the seizure of the vessel, and at the same time to grant an order to show cause why the vessel should not be sold to satisfy the lien. A copy of the order and the application for the warrant must be served personally upon the master or other person in charge of the vessel, "and personally upon the owner and consignee of such vessel if a resident of the State, or if not a resident of the State, by mail addressed to such owner or consignee at his last known place of residence, within ten days after the

execution of such warrant." Sections 3422 and 3423. By section 3424, the applicant is also required to give notice in some paper published in the county where the vessel was seized, "stating the issuance of the warrant, the date thereof, the amount of the claim specified therein, the name of the applicant, and the time and place of the return of the order to show cause." By section 3425, the owner or consignee, or any other person interested, may appear and contest the claim of the lienor. Subsequent provisions authorize an appeal, as in other civil cases. The record shows that the proceedings had were substantially in accordance with these provisions. The application, called a petition, was filed, setting forth all the facts required, including the name of the owner. An order of sale and an order to show cause were both issued, and the owner appeared in response to such notice. It is true there is in the record no proof of service upon the owner, but the fact of her appearance to contest the application is shown. It is also true that she did not after her appearance contest the amount of the claim, but contented herself with challenging the jurisdiction of the court. But such action on her part does not obviate the fact that the proceedings on behalf of the petitioner were substantially those to collect a civil debt by attachment against the property of the defendant. In this connection reference may be had to *The Hine* v. *Trevor*, 4 Wall. 555, in which an Iowa statute was held unconstitutional, but, as said by Mr. Justice Miller, speaking for the court, on page 571, describing the remedy provided for by that statute:

"The remedy pursued in the Iowa courts, in the case before us, is in no sense a common law remedy. It is a remedy partaking of all the essential features of an admiralty proceeding *in rem*. The statute provides that the vessel may be sued and made defendant without any proceeding against the owners, or even mentioning their names. That a writ may be issued and the vessel seized, on filing a petition similar in substance to a libel. That after a notice in the nature of a monition,

the vessel may be condemned and an order made for her sale, if the liability is established for which she was sued. Such is the general character of the steamboat laws of the Western States."

But in the very same case it was also said by the learned justice:

"While the proceeding differs, thus from a common law remedy, it is also essentially different from what are in the West called suits by attachment, and in some of the older States foreign attachments. In these cases there is a suit against a personal defendant by name, and because of inability to serve process on him on account of non-residence, or for some other reason mentioned in the various statutes allowing attachments to issue, the suit is commenced by a writ directing the proper officer to attach sufficient property of the defendant to answer any judgment which may be rendered against him. This proceeding may be had against an owner or part owner of a vessel, and his interest thus subjected to sale in a common law court of the State.

"Such actions may, also, be maintained *in personam* against a defendant in the common law courts, as the common law gives; all in consistence with the grant of admiralty powers in the ninth section of the Judiciary Act."

So in the case at bar, we have a proceeding authorized by the statute in which the owner is named, and notice required to be served on him, and notice in fact served, an appearance of the defendant and an opportunity to try the merits of the claim, as in any other civil action.

That a State has full control over the practice and procedure to be pursued in its courts has been often adjudged. Thus in *Missouri* v. *Lewis*, 101 U. S. 22, 31, it was said by Mr. Justice Bradley, speaking for the court:

"We might go still further, and say, with undoubted truth, that there is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory."

Again, in *Ex parte Reggel*, 114 U. S. 642, 651, Mr. Justice Harlan used these words:

"That Commonwealth [Pennsylvania] has the right to establish the forms of pleadings and process to be observed in her own courts, in both civil and criminal cases, subject only to those provisions of the Constitution of the United States involving the protection of life, liberty and property in all the States of the Union."

So Mr. Justice White, speaking for the court, in *Iowa Central Railway Company* v. *Iowa*, 160 U. S. 389, 393, declared:

"But it is clear that the Fourteenth Amendment in no way undertakes to control the power of a State to determine by what process legal rights may be asserted or legal obligations be enforced, provided the method of procedure adopted for these purposes gives reasonable notice and affords fair opportunity to be heard belore the issues are decided."

See, also, *Chicago, Burlington & Quincy Railroad* v. *Chicago*, 166 U. S. 226; *Backus* v. *Fort Street Union Depot Company*, 169 U. S. 557, 570; *Brown* v. *New Jersey*, 175 U. S. 172; *League* v. *Texas*, 184 U. S. 156, 158.

But it is said that while this is generally true there is this limitation, that the State cannot, as to claims against vessels, adopt the procedure now obtaining in admiralty cases, or, without actual notice to the owner, seize and sell a vessel in satisfaction of a lien. Of course, it is not necessary to determine that question, because, as I have stated, there was notice to the owner and an appearance by her, and such proceeding was authorized by the statute. But even if it was not so authorized, and was simply a direct proceeding to enforce a lien upon the vessel and sell it in satisfaction thereof, I insist that the state courts may entertain jurisdiction. It was held in *Arndt* v. *Griggs*, 134 U. S. 316, that a State may provide by statute that the title to real estate within its limits shall be settled and determined by a suit in which the defendant, being a non-resident, is only brought into court by publication. The question was discussed at length, the authorities

reviewed, and the conclusion reached that the State had such jurisdiction over real estate within its limits that it could determine the title without the personal presence of the owner. But has the State any less jurisdiction over personalty situated within its borders than it has over real estate? Upon what theory of state power can it be held that a State may divest a non-resident of his title to real estate and not a non-resident of his title to personal property? There seems to be a contention that there is a peculiar sanctity in the form of admiralty proceedings which excludes the States from resort to them, but the jurisdiction of the admiralty courts does not depend on the form of the procedure. Congress may if it see fit change entirely that procedure. As said by Chief Justice Taney in *The Genesee Chief*, 12 How. 443, 460:

"'The Constitution declares that the judicial power of the United States shall extend to 'all cases of admiralty and maritime jurisdiction.' But it does not direct that the court shall proceed according to ancient and established forms, or shall adopt any other form or mode of practice. The grant defines the subjects to which the jurisdiction may be extended by Congress. But the extent of the power as well as the mode of proceeding in which that jurisdiction is to be exercised, like the power and practice in all the other courts of the United States, are subject to the regulation of Congress, except where that power is limited by the terms of the Constitution or by necessary implication from its language. In admiralty and maritime cases there is no such limitation as to the mode of proceeding, and Congress may therefore in cases of that description give either party right of trial by jury, or modify the practice of the court in any other respect that it deems more conducive to the administration of justice."

Suppose Congress should exercise this power and substitute for the procedure in admiralty courts the common law practice, and make it the only method of procedure therein. What would become of the argument that the State cannot resort to the procedure obtaining in admiralty courts for enforcing

the rights of claimants?   Must it then desist from common law remedies because they have been adopted in admiralty and go ·back to that form of procedure now obtaining in the admiralty courts?   Can it be that the power of a State to vest jurisdiction in one of its· courts depends upon the form of procedure which it adopts?

Why should we be so anxious to drive parties having small claims away from their local courts to courts not infrequently held at a great distance?   Why should we be so anxious to force litigants into a court where there is no constitutional right to a trial by jury?   I for one believe that the right of trial by jury is not to be taken away from a claimant unless it be a case coming clearly within the well-established limits of equity and admiralty cases.   I do not like to see these provisions which have so long been the boast of our Anglo-Saxon system of procedure frittered away by either legislative or judicial action.

Further,_it seems a great hardship that a party who has been brought into a court of general jurisdiction, with full opportunity to litigate the claim of the plaintiff, and has carried the case through all the courts of the State without ever disputing its validity, should now obtain a reversal of the entire proceedings when such reversal may operate to prevent the collection of the· debt.   By section 33 of chapter 418, heretofore referred to, the lien expires at the expiration of twelve months from the time the debt was contracted.   Of course, the lien is now gone. · The canalboat has very likely disappeared and the owner may be entirely irresponsible.

Even if these objections to the opinion and judgment of the court are wholly without foundation, there is still another, broader and deeper.   I do not believe that under the true interpretation of the Constitution the admiralty jurisdiction of the Federal courts extends to contracts for the repairs of vessels engaged wholly in commerce within a State. I recognize the fact that this court has decided in a series of cases, commencing with *The Genesee Chief*, 12 How. 443, that

the admiralty jurisdiction of the Federal courts is not limited by tide waters, as admiralty jurisdiction was understood to be limited both in Great Britain and in this country at the time the Constitution was framed, but extends to all navigable waters of the United States, and I have no disposition to question the correctness of those decisions, or in any way limit their scope. But what is admiralty? It is the law, not of the water, but of the seas.

As said in Edwards on Admiralty Jurisdiction, p. 29:

"But its jurisdiction may be said to rest generally on the following considerations: First, the nature of the property to be adjudicated upon; secondly, the question to be decided; thirdly, the origin of the cause; and fourthly, the locality; and these must be *of the sea* to give the admiralty a jurisdiction."

So also in *Edwards* v. *Elliott*, 21 Wall. 532, 553, is this declaration of this court:

"Maritime contracts are such as relate to commerce and navigation, and unless a contract to build a ship is to be regarded as a maritime contract, it will hardly be contended that a contract to furnish the materials to be used in accomplishing that object can fall within that category, as the latter is more strictly a contract made on land, and to be performed on land, than the former, and is certainly one stage further removed from any immediate and direct relation to commerce and navigation."

It grew up out of the fact that the ocean is not the territorial property of any nation, but the common property of all; that vessels engaged in commerce between the different nations ought, so far as possible, to be subject to a uniform law, and not annoyed by the conflicting local laws and customs of the several nations which they visit. I do not mean that the several maritime nations did not establish different rules, or that there is not some dissimilarity in their maritime laws, for as long as each nation is the master of its own territory it may legislate as it sees fit in reference to maritime matters coming within its jurisdiction, and yet this does not abridge the fact

that admiralty grew up out of the thought of having a common law of the seas. It was well said by Mr. Justice Bradley in *The Lottawanna*, 21 Wall. 558, 572:

"Perhaps the maritime law is more uniformly followed by commercial nations than the civil and common laws are by those who use them. But, like those laws, however fixed, definite and beneficial the theoretical code of maritime law may be, it can have only so far the effect of law in any country as it is permitted to have. But the actual maritime law can hardly be said to have a fixed and definite form as to all the subjects which may be embraced within its scope. Whilst it is true that the great mass of maritime law is the same in all commercial countries, yet, in each country, peculiarities exist either as to some of the rules or in the mode of enforcing them. Especially is this the case on the outside boundaries of the law, where it comes in contact with or shades off into the local or municipal law of the particular country and affects only its own merchants or people in their relations to each other. Whereas, in matters affecting the stranger or foreigner, the commonly received law of the whole commercial world is more assiduously observed—as, in justice, it should be. No one doubts that every nation may adopt its own maritime code. France may adopt one, England another, the United States a third; still, the convenience of the commercial world, bound together, as it is, by mutual relations of trade and intercourse, demands that, in all essential things wherein those relations bring them in contact, there should be a uniform law founded on natural reason and justice. Hence the adoption by all commercial nations (our own included) of the general maritime law as the basis and groundwork of all their maritime regulations. . . . Each State adopts the maritime law, not as a code having any independent or inherent force, *proprio vigore*, but as its own law, with such modifications and qualifications as it sees fit. Thus adopted and thus qualified in each case, it becomes the maritime law of the particular nation that adopts it. And without such voluntary adoption

it would not be law. And thus it happens that from the general practice of commercial nations in making the same general law the basis and groundwork of their respective maritime systems, the great mass of maritime law which is thus received by these nations in common comes to be the common maritime law of the world."

In the opinion of Chief Justice Taney, in *The Genesee Chief,* 12 How. 443, in which this court for the first time held that the jurisdiction of the admiralty courts extended above tide water, the argument is thus stated (p. 454):

"In England, undoubtedly, the writers upon the subject, and the decisions in its courts of admiralty, always speak of the jurisdiction as confined to tide water. And this definition in England was a sound and reasonable one, because there was no navigable stream in the country beyond the ebb and flow of the tide; *nor any place where a port could be established to carry on trade with a foreign nation,* and where vessels could enter or depart with cargoes. In England, therefore, tide water and navigable water are synonymous terms, and tide water, with a few small and unimportant exceptions, meant nothing more than public rivers, as contradistinguished from private ones; and they took the ebb and flow of the tide as the test, because it was a convenient one, and more easily determined the character of the river. Hence the established doctrine in England, that the admiralty jurisdiction is confined to the ebb and flow of the tide. In other words, it *is* confined to public navigable waters.

"At the time the Constitution of the United States was adopted, and our courts of admiralty went into operation, the definition which had been adopted in England was equally proper here. In the old thirteen States the far greater part of the navigable waters are tide waters. And in the States which were at that period in any degree commercial, and where courts of admiralty were called on to exercise their jurisdiction, every public river was tide water to the head of navigation. *And, indeed, until the discovery of steamboats,*

*there could be nothing like foreign commerce upon waters with
an unchanging current resisting the upward passage.*   The courts
of the United States, therefore, naturally adopted the English
mode of defining a public river, and consequently the boundary
of admiralty jurisdiction.   It measured it by tide water.   And
that definition having found its way into our courts, became,
after a time, the familiar mode of describing a public river, and
was repeated, as cases occurred, without particularly exam-
ining whether it was as universally applicable in this country
as it was in England."

  Again, as said by this court, in *The Propeller Commerce*, 1
Black, 574, 579:

"All such waters are, in truth, but arms of the sea, and are
as much within the admiralty and maritime jurisdiction of
the United States as the sea itself."

  Such being the general nature of admiralty, and the juris-
diction of its courts being understood, at the time of the adop-
tion of our Constitution, to relate to the ocean and the arms
thereof, with the view of uniformity in respect to international
commerce, what was granted to the general government when
to its courts was given exclusive jurisdiction over "all cases
of admiralty and maritime jurisdiction?"   Did it mean that
the judicial power of the United States should extend to con-
troversies respecting contracts and torts concerning every ves-
sel upon all the waters of the several States?   It is not pre-
tended that it did.   Take an inland lake, wholly within the
limits of the territory of a State and having no connection
with the ocean.   The admiralty jurisdiction of the Federal
courts does not extend to contracts or collisions in respect to
or upon such waters.   *The Montello*, 11 Wall. 411.   But why
should the admiralty jurisdiction of the United States courts
not extend to landlocked waters wholly within the limits of a
State when it does extend to waters having connection with
the ocean?   Clearly, as shown by the quotation from Chief
Justice Taney's opinion in *The Genesee Chief*, because since
the use of steam, foreign commerce may extend into such

waters, and therefore, the full exercise of the admiralty juris-
diction which concerns the law of the sea requires that that
jurisdiction should be co-extensive with waters which may
be traversed by oceangoing vessels. It matters not whether
such waters are natural or artificial highways, canals or rivers.
If they open to the ocean or are connected with the ocean
they become, or may become, the highways of ocean com-
merce, and therefore in order that the admiralty jurisdiction
may be fully exercised it was held, and rightfully, in *The
Genesee Chief*, that it extends to all navigable waters of the
United States. Take the case of a landlocked lake, within
the limits of New York. Unquestionably the State has full
jurisdiction over its waters and the vessels traversing them.
The admiralty courts of the United States would not assume
any jurisdiction. Can it be that if the State of New York
constructs a canal by which the waters of that lake are con-
nected with the ocean, it is deprived of its full jurisdiction
over those waters and the vessels traversing them? Doubt-
less to a certain extent and for the purpose of fully effectuat-
ing the admiralty jurisdiction of the nation the Federal courts
in admiralty would have a certain jurisdiction. Take the case
of *The Diana*, Lush. 539, in which Dr. Lushington assumed
jurisdiction over a collision between two British vessels in the
Great North Holland Canal. Can it for a moment be sup-
posed that the English admiralty courts would take jurisdic-
tion of a claim for repairs made on a Dutch canalboat in such
canal; or, to bring the case nearer home, would the British
admiralty courts take jurisdiction of the claim of this plain-
tiff for the work done upon the defendant's canalboat? Or
would the admiralty courts of the United States take juris-
diction of a like action brought for repairs done to a canalboat
on the canal between Liverpool and Manchester? Clearly
these matters are of local significance, and of local signifi-
cance alone.

If it be said that the State of New York in the case cited
would, notwithstanding the construction of a canal between

the hitherto landlocked lake and the ocean, still retain juris-
diction to enforce claims for repairs, but only by proceedings
according to the course of the common law, I reply that, while
it remained still a landlocked lake with no connection with
the ocean, the State of New York, having full jurisdiction,
could, as we have seen, resort to any proceeding it saw fit for
the enforcement of claims for repairs.   It has full control over
its own procedure and may change and alter it as it sees fit.

Can it be that, having such power before the waters are
connected with the ocean, it loses that power by the act of
connecting the waters with the ocean, and is deprived of its
hitherto unquestioned control over the remedies it chooses to
provide?

But it is said that given the fact that the admiralty juris-
diction of the Federal courts extends to all navigable waters
of the United States, and that such jurisdiction is exclusive,
it follows that the moment any navigable waters are con-
nected with the ocean the jurisdiction of the Federal courts
over those waters becomes exclusive.   In this case we touch
upon the difference between contracts and torts.   As said in
*The Belfast*, 7 Wall. 624, 637:

"Principal subjects of admiralty jurisdiction are maritime
contracts and maritime torts, including captures *jure belli*,
and seizures on water for municipal and revenue forfeitures.

"(1.) Contracts, claims, or service, purely maritime, and
touching rights and duties appertaining to commerce and navi-
gation, are cognizable in the admiralty.

"(2.) Torts or injuries committed on navigable waters, of
a civil nature, are also cognizable in the admiralty courts.

"Jurisdiction in the former case depends upon the nature
of the contract, but in the latter it depends entirely upon
locality."

We have here no matter of torts; but simply one of contract.
The question, therefore, is not one of locality, but one of the
nature of the contract.   The contract was for work done, not
on an oceangoing vessel or one capable of engaging in foreign

commerce, or, like a tug, *The Glide,* 167 U. S. 606, one which can be used directly in assisting foreign commerce, but a canal-boat necessarily used only on inland waters, and in fact only so used. Can this fairly be adjudged a maritime contract? I think not. *Wilson* v. *Lawrence,* 82 N. Y. 409; *Edwards* v. *Elliott,* 21 Wall. 532. In addition to the fact that this boat was designed primarily for use upon a canal, to be drawn by animals moving on the land, the place at which the work was done is also worthy of consideration. While the admiralty jurisdiction may extend to canals, yet the United States have no such exclusive control over canals as over natural navigable waters. The canal was built by the State, is owned by the State, and it cannot for one moment be assumed that the national government can interfere to restrict the State as to the size of the canal, the depth of water, the construction of bridges, or other things in respect to which it has full control over the natural navigable waters. It seems an anomaly that when the State builds a waterway and owns a waterway, and has a general control over that waterway, it cannot provide as it sees fit for enforcing claims for work done on vessels navigating such highway when the vessels are of a character which prevents them being used for any foreign commerce.

Recapitulating: I dissent from the opinion and judgment of the court because, first, I think the contract, being made on land, for work to be done on land, and in fact done upon the land, is not a maritime contract, and therefore cannot be a subject of admiralty jurisdiction. Second, the proceeding, which was instituted was authorized by the statutes of the State, and in its essential features an ordinary proceeding according to the course of the common law, which may always be resorted to, even in respect to contracts which are of strictly a maritime nature. Third, because the grant to the national government over admiralty and maritime matters was in furtherance of commerce between this nation and others and designed to secure uniformity in respect thereto, and does not extend to contracts made in respect to vessels which are in-

capacitated from foreign commerce, designed and used exclusively for mere local traffic within a State.

I am authorized to say that the CHIEF JUSTICE and MR. JUSTICE PECKHAM concur in this dissent.

MR. JUSTICE HARLAN also dissents.